[No. B156300. Second Dist., Div. One. Mar. 28, 2003.]

ELLER MEDIA COMPANY, Plaintiff and Appellant, v.
COMMUNITY REDEVELOPMENT AGENCY, Defendant and
Respondent.

28

COUNSEL

Richard Hamlin Attorneys and Paul A. Jacobs for Plaintiff and Appellant.

Law Offices of Kathryn Reimann, Kathryn Reimann, Dov S. Lesel and Curt Holguin for Defendant and Respondent.

OPINION

SPENCER, P. J.—

### INTRODUCTION

Plaintiff Eller Media Company (Eller) appeals from the judgment denying its petition for writ of administrative mandamus and request for declaratory relief. We affirm the judgment.

### PROCEDURAL AND FACTUAL BACKGROUND[1]

In May 1986, the Los Angeles City Council adopted the Hollywood Redevelopment Plan (Plan), which encompasses a 1,100-acre area in Hollywood. The validity of the Plan was upheld in *Morgan v. Community Redevelopment Agency* (1991) 231 Cal.App.3d 243 [284 Cal.Rptr. 745].

In May and June 1999, Eller, which is engaged in the business of outdoor advertising, applied to the Los Angeles City Department of Building and Safety for building permits to construct two billboards within the Hollywood Redevelopment Project Area (Project Area). One billboard was to be constructed at 6601-6613 Sunset Boulevard (Sunset site); the other was to be constructed at 1400 North Cahuenga Boulevard (Cahuenga site). In accordance with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA), the community redevelopment agency (CRA) undertook an initial study (Initial Study) of each proposal to determine whether the proposed signs conformed to the Plan and whether the final environmental impact report (EIR) prepared for the Plan encompassed the construction of the billboards.

The Initial Study for the proposed Sunset site revealed, among other things, that the billboard may have significant adverse impacts to historic resources and to community aesthetics. CRA advised Eller that "[c]onstruction and operation of the proposed Billboard amounts to new information of

---

[1]Additional facts will be incorporated into the legal discussion where relevant.

substantial importance showing one or more significant effects not discussed in the Final [EIR] for the Hollywood Redevelopment Project which was certified in January 1986 [SCH No. 85052903]. Additionally, approval of this proposal would amount to a substantial change in the manner in which the Hollywood Redevelopment Project would be implemented by adversely affecting a building or resource determined by the Agency to be architecturally or historically significant." Accordingly, no action could be taken by CRA with regard to the proposed billboard until completion and certification of a supplemental EIR (SEIR).

The Initial Study for the proposed Cahuenga site also found potential adverse impacts. Modifying the proposed billboard in certain particulars could mitigate these impacts, however.

Although CRA gave Eller ample time to respond, Eller failed to advise CRA whether it would proceed with the SEIR and mitigation measures. CRA staff therefore denied Eller's applications to construct billboards at the Sunset and Cahuenga sites based upon the determination that the proposed billboards did not comply with the Plan. CRA staff's denial also was based upon Eller's refusal to provide an SEIR for the Sunset site and unwillingness to address the potential significant adverse impacts identified in the Initial Study pertaining to the Cahuenga site.

Eller appealed the determinations of CRA staff to the Board of Commissioners of CRA (Board of Commissioners). With regard to the Sunset site, Eller sought to set aside CRA's determination that Eller's permit application required an SEIR. With regard to the Cahuenga site, Eller challenged CRA's determination that construction of the billboard would have potentially significant adverse impacts. Eller further maintained that CRA's determinations "procedurally and substantively fail[ed] to comply with the provisions of [CEQA] . . . ." Following a hearing, the Board of Commissioners voted unanimously to approve a motion to uphold CRA staff's denials of permit applications for the proposed billboards at the Sunset and Cahuenga sites.

Eller thereafter filed this action in the trial court. Eller sought a peremptory writ of mandate commanding CRA to approve Eller's sign applications as being in compliance with the Plan. Eller further sought a declaration that CRA denied Eller equal protection of the laws under the state and federal constitutions. Following a hearing, the trial court entered judgment denying Eller all relief and awarding CRA costs. This appeal followed.

CONTENTIONS

Eller raises the following contentions on appeal: (1) Substantial evidence does not support CRA's determinations that Eller's signs did not conform

with the Plan; (2) CRA abused its discretion in determining that Eller was required to prepare an SEIR for the billboard it proposed to construct at the Sunset site; (3) the Initial Study for both signs does not conform to CEQA guidelines and required Eller to comply with nonexistent standards; and (4) CRA is not the lead agency responsible for making environmental determinations under CEQA. We discern no merit to these contentions.

DISCUSSION

*Standard of Review*

Public Resources Code section 21168 provides that "[a]ny action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

Public Resources Code section 21168.5 states that "[i]n any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

As noted in *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359 [43 Cal.Rptr.2d 170], "[t]he distinction, however, is rarely significant. In either case, the issue before the trial court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence. [Citations.]" (At p. 1375.) Thus, "[i]n a mandate proceeding to review an agency's decision for compliance with CEQA, the scope and standard of our review are the same as the trial court's, and the lower court's findings are not binding on us. [Citation.] We review the administrative record to determine whether the agency prejudicially abused its discretion." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116-117 [104 Cal.Rptr.2d 326].)

I

Eller contends CRA's determinations that its billboards do not conform to the Plan are not supported by substantial evidence. In order to evaluate this argument adequately and to place Eller's arguments in context, we delineate at length the findings set forth in the Initial Studies.

One of the multitude ·of questions with which the Initial Study pertaining to the Sunset site was concerned was, "Would the proposal conflict with applicable plans or policies adopted by agencies with jurisdiction over the project?" (Boldface omitted.) The study found that the proposal would have a potentially significant impact, stating, "The site of the proposed billboard is located within the [Project Area]. It is inconsistent with the following goals set forth in the . . . Plan for the Hollywood Redevelopment Project:

"Redevelopment Plan Goal 5

"Improve the quality of the environment, promote a positive image for Hollywood and provide a safe environment through mechanisms such as:

"b. promoting architectural and urban design standards [¶] . . . [¶]

"e. *promoting* sign and billboard standards [¶] . . . [¶]

"g. promoting rehabilitation and restoration guidelines[]

"h. integrat(ing [*sic*] public safety concerns into planning efforts.

"The proposed sign does not conform to the above provision of the . . . Plan for the following reasons:

"• The proposed Billboard impacts an important streetscape feature in that it would create an inappropriate backdrop to a line of historic palm trees along Sunset Boulevard.

"• The proposed Billboard, at 52' tall, is incompatible with the scale of the 22' tall historic structure on the site.

"• The proposed Billboard would potentially impact views of the historic church building and tower to the west of the site.

"• The location of the support structure proximate to the sidewalk on Cassil Place and the cantilevering of the Billboard over the historic building, results in a design that appears non-integral to the design and site planning of the parcel.

"• The location of the support structure proximate to the sidewalk on Cassil Place may attract graffiti which may not be promptly eradicated and which could result in an appearance of an unsafe public area contrary to the communities [*sic*] efforts to reduce the actual and perceptual levels of crime in Hollywood.

"Redevelopment Goal 10

"Promote the development of sound residential neighborhoods through mechanisms such as land use, density and design standards, public improvements, . . . development of open space . . . to enable residents to live and work in Hollywood.

"The proposed Billboard does not conform to the above provision of the . . . Plan for the following reasons:

"• The height of the proposed Billboard (52') would be incompatible with the scale of the one and two story residential buildings to the north.

"• The proposed Billboard would impact the views from the church playground across Cassil Place." (Italics omitted.)

The Initial Study also found that the proposed Sunset billboard may be in conflict with sections 505, 508.4 and 511 of the Plan. With regard to these specific provisions, the Initial Study for the Sunset site stated:

"Section 505 — Enhance the environmental quality of residential areas.

"The proposed Billboard does not conform to this provision of the . . . Plan because its proposed height of 52' would be incompatible with the scale of the one and two story residential buildings to the north.

"Section 508.4 — The Project Area lacks adequate open space, recreational areas and landscaping. An objective of the Plan is to provide large usable publicly accessible open spaces, which are an organic part of the urban environment.

"The proposed Billboard does not conform to the above provision of the . . . Plan because the proposed Billboard would impact views to and from the Church playground open space and the proposed Billboard would be incompatible with the scale of the Church playground open space.

"Section 511 — No . . . permit shall be issued by the City for any property within the . . . Project Area which involves or is determined by the

Agency to adversely affect any building or resource determined by the Agency to be architecturally or historically significant, . . . (until there is elapsed) . . . a reasonable period of time . . . not to exceed 180 days . . . to permit negotiations to occur and opportunities to be explored, to seek to avoid or mitigate any adverse impact on any such architecturally or historically significant building or resource. . . . The Agency may extend the initial 180-day period up to an additional 180 days.

"The proposed Billboard would adversely affect architectural and historically significant buildings and does not conform to the above provision of the . . . Plan for the following reasons:

"● Its height (52 ft.) would be incompatible in size with the historic structure (22 ft.) on the parcel and the scale of the proposed Billboard (14 ft. × 48 ft. = 672 sq. ft.) would dwarf the scale and character of the Spanish Churringuesque [*sic*] architecture and ornament of the building.

"● The proposed Billboard would impact historic or notable features of building or site.

"● The proposed Billboard would introduce an inappropriate sign form for the historic building, district, and potentially significant neighborhood. Billboards were not cantilevered over structures in the manner or built at this scale in the 1920s and 1930s when the building on the site and the other buildings in this 'potential significant neighborhood' were designed and developed.

"Conclusion: The proposed Billboard is inconsistent with a number of goals and provisions of the . . . Plan as they pertain to this site. Potentially significant impacts could occur. Issues related to billboards and their potential impact on the visual, aesthetic, and historic environment were not addressed in the Final [EIR] for the . . . Project. Therefore, the impacts of the proposed Billboard relating to consistency with the . . . Plan will be analyzed in a Supplemental EIR." (Italics omitted.)

An analysis of the question "Would the proposal be incompatible with existing land uses in the vicinity?" yielded a finding of "Potentially Significant Impact." (Boldface omitted.) The Initial Study expounded: "The site of the proposed Billboard is located in an area characterized by office, retail, religious, club, and parking uses. Single and multiple story office/commercial buildings are located adjacent to the east and across Sunset Boulevard to the south. Residential uses are located adjacent and proximate to the north of the site and a church and parochial school playground are located across

Cassil Place to the west of the site. The scale and character of the proposed Billboard facing the church and playground may be inappropriate to these adjacent uses. Residential uses are located immediately to the north of the site of the proposed Billboard. The scale and character of the proposed Billboard in relationship to its proximity to residential uses may be inappropriate."

The Initial Study then concludes that "[t]he proposed Billboard is inconsistent with adjacent land uses. Significant impacts could occur. Issues related to billboards and their impact on adjacent land uses such as religious facilities, schools, and the residences was [*sic*] not addressed in the Final EIR for the . . . Project. Therefore, the proposed Billboard shall be analyzed in a Supplemental EIR."

The Initial Study also concluded that the proposal would have a potentially significant impact on a scenic vista or highway and would have a demonstrable negative aesthetic effect. The study explained that "[t]he proposed Billboard site is located on Sunset Boulevard, which is designated as a 'Major Scenic Highway' in the Hollywood Community Plan of the City of Los Angeles. In addition, the advertising panel would extend to a height of 52' above the Boulevard and is proposed to be oriented toward the west to maximize views by motorists, pedestrians, and visitors traveling east along this scenic highway. The height and scale of the proposed Billboard would create an inappropriate backdrop to a key scenic element of this portion of Sunset Boulevard and a quintessential image of Hollywood, the historic palm trees edging the Boulevard. The trunks, of these palms, frame views of historic structures that line the street and the trees form a distinctive silhouette against the sky."

It further explained that "[t]he proposed Billboard includes a new larger-scale structure, which could potentially affect the visual environment in this area of the City. Potential negative effects could result from the following characteristics:

"● The height of the proposed Billboard towers above the historic building on the site thus presenting incongruent scale;

"● The massiveness and scale of the proposed Billboard and its support structure has [*sic*] no relationship to the historic building on the site;

"● The height and massiveness of the proposed Billboard and its support structure introduces [*sic*] an uncharacteristic design element not originally developed or appropriately found in a setting of historic buildings of this type;

"• The height, size, and orientation of the advertising area toward the west are maximized to ensure visibility from a great distance of motorists, pedestrians, and visitors traveling east on Sunset Boulevard creating an inappropriate backdrop to the scale and character of the historic buildings adjacent and proximate to the proposed Billboard;

"• The height, size, and orientation of the advertising area are maximized to ensure visibility from a great distance along Sunset Boulevard thus introducing an inappropriate aesthetic element along this designated scenic highway.

"• The height and scale of the proposed Billboard would create an inappropriate backdrop to a key aesthetic element of this portion of Sunset Boulevard — the line of historic palm trees edging the Boulevard. The trunks of these palm trees frame views of historic structures that line the street and the trees form a distinctive silhouette against the sky."

The Initial Study further concluded "[t]he proposed Billboard is inconsistent with a number of goals and provisions of the . . . Plan as it pertains to this site and would result in significant impacts. Issues related to billboards and their potential impact on scenic highways in the . . . Project Area [and their potential impact on the visual and aesthetic environment] were not addressed in the Final [EIR] for the . . . Project. Therefore the proposed Billboards shall be analyzed in a Supplemental EIR."

The final potentially significant concern identified by the Initial Study pertaining to the Sunset site was the billboard's propensity to "increase the number of light sources in the area, which could affect nearby buildings. The impact of light and potential glare can be mitigated by such measures as use of lower-intensity lights, lighting shields or other design features, which direct light into the project site, and/or turning off the illumination during late night hours." The conclusion reached was that "[a]nalysis of this issue should be addressed in the Supplement to the Final EIR and mitigation recommended."

With respect to Eller's Cahuenga site proposal, the Initial Study found that it was inconsistent with goal 5 of the Plan, as well as sections 508.4 and 511 of the Plan. The Initial Study concluded that potentially significant impacts would occur unless specific mitigating measures were implemented. The Initial Study further concluded that the Cahuenga proposal would have a potentially significant negative aesthetic effect and potential significant effect on light sources unless mitigated.

The Plan contains numerous references to development and design standards for signs and billboards. One of the enumerated goals set forth in

section 300 of the Plan is goal 5 which, among other things, seeks to "[i]mprove the quality of the environment, promote a positive image for Hollywood and provide a safe environment through mechanisms such as: [¶] . . . [¶] . . . promoting sign and billboard standards." Section 503 authorizes the CRA "to adopt development and design guidelines, after a public hearing, which are intended to carry out the goals of the Plan." It expressly authorized the adoption of "development standards including standards for: types of uses; building heights; land coverage; bulk; size; density; landscaping including walls, fences and hedges; setbacks which may include development and landscaping within the setbacks; design criteria including architectural style; loading areas, service facilities which may include . . . signs and billboards . . . ."

Section 516 of the Plan, pertaining to "Signs and Billboards," provides as follows: "All signs must conform to City sign and billboard standards as they now exist or are hereafter legislated. It is recognized that the coordination of signs and billboards within the project area affect its appearance and image. Therefore, it is the intent of this Plan that the Agency may, after public hearing, adopt additional sign and billboard standards for a portion of or the entire Project Area which may be more restrictive than City standards in order to further the goals of this Plan or the objectives of a special district as established by this Plan."

It is undisputed that as of April and May 2000, when CRA found that Eller's proposed billboards did not comply with the Plan, CRA had not yet adopted any additional sign and billboard standards.[2] Eller maintains that "[t]he failure of the CRA to comply with the Plan by adopting design standards for billboards provides it unbridled discretion to impose its own subjective criteria." Eller further maintains that in assessing Eller's proposals, the CRA relied upon "more ambiguous, general standards that do not specifically apply to billboards" and "then substituted its own generalized, ad hoc standards and findings to the proposed Eller signs." Eller maintains that the CRA's findings "subject Eller to standards limited only by the whim of the staff person analyzing the projects." Eller has failed to establish any of these claims.

Section 504 of the Plan states: "No . . . building permit . . . shall be issued in the Project Area from the date of adoption of this Plan unless and

---

[2]It was not until November 15, 2001, the same day briefing in this matter was completed, that the CRA adopted resolution No. 6007. This Title Resolution Adopting a Design for Development Prohibiting the Construction of Pole Sign and Billboard Structures and Providing Standards for Other Sign Structures in the Hollywood Redevelopment Project Area, among other things, banned all billboards and pole signs in the project area.

until the application therefore has been reviewed by the Agency and determined to be in conformance with the Plan . . . ." In accordance with this provision, the CRA was duty bound to determine if Eller's proposed billboards conformed with the Plan. The performance of this duty was not dependent upon CRA's exercise of its permissive power to adopt specific standards relating to signs and billboards in the Project Area. In the absence of such standards, CRA nevertheless was required to consult with the existing provisions of the Plan to determine if Eller's proposed billboards did or did not conform to the Plan. Eller has made no showing that CRA's factual determinations in this case were the product of unbridled discretion and ad hoc standards. While it argues as much, "argument is not evidence." (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1319 [88 Cal.Rptr.2d 758].)

Next, Eller asserts that having failed to develop design standards for signs and billboards, "CRA relies upon other generalized goals and sections of the Plan to justify its findings of non-conformance." Eller maintains that "[t]he CRA's reliance upon generalized provisions of the Plan, rather then [*sic*] the specific sections related to billboard standards, violates the rule of interpretation known as *ejusdem generis*." Eller's reliance on this rule of statutory construction is misplaced.

■ As noted in *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004 [100 Cal.Rptr.2d 413], "[i]n the interpretation of written laws, the intent of the legislative body is not gleaned solely from introductory statements such as a preamble, but is gleaned from the law as a whole, which includes particular directives. [Citation.] As a general rule, known as the canon of *ejusdem generis*, the enumeration of specific items or factors will be controlling over general statements placed before or after the list of specific items or factors. [Citation.] In other words, 'the general term or category is "restricted to those things that are similar to those which are enumerated specifically." ' [Citation.]" (At p. 1013.) The doctrine of *ejusdem generis* is simply a rule of statutory construction that will not be applied to defeat legislative intent, however. (*Walker v. Meehan* (1987) 194 Cal.App.3d 1290, 1298 [240 Cal.Rptr. 171]; *Coleman v. City of Oakland* (1930) 110 Cal.App. 715, 718 [295 P. 59].) Indeed, "to the extent the doctrine results in a strict construction of the statute, it has been abolished in California." (*Walker, supra,* at p. 1298.)

■ Eller asserts that since section 516 of the Plan specifically deals with the topic of signs and billboards, CRA could assess Eller's proposals only in light of this section. Stated otherwise, Eller maintains that CRA could not rely on any of the general provisions of the Plan in evaluating its permit applications. We disagree. A redevelopment plan sets forth a "comprehensive method or scheme of action; a way proposed to carry out . . . a

particular project of redevelopment." (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 52 [37 Cal.Rptr. 74, 389 P.2d 538].) As such, the assessment of a development proposal must be made with reference to the whole plan. (Cf. *Brown v. Superior Court* (1984) 37 Cal.3d 477, 484 [208 Cal.Rptr. 724, 691 P.2d 272].) The principle of *ejusdem generis* cannot be applied in this case to defeat the goals of the Plan. We therefore conclude that the doctrine is inapplicable and that CRA correctly evaluated Eller's proposals in light of the entire Plan.

Eller further represents that its proposed billboards comply with regulations pertaining to off-site signs set forth in the Los Angeles Municipal Code and that CRA has never claimed otherwise. To the extent these statements amount to an implicit assertion that, in light of CRA's failure to adopt more stringent standards pertaining to signs and billboards in the Project Area, a finding of compliance with the Plan was required if the proposed billboards otherwise conformed to the Los Angeles Municipal Code, we reject it. Eller's argument simply fails to take into account the requirements of CEQA. That a billboard complies with sign specifications in a local zoning ordinance does not mean necessarily that it comports with CEQA and consequently does not entitle the applicant to automatic approval of the permit application for that billboard.[3]

II

 Eller next contends CRA abused its discretion when it determined that Eller was required to prepare an SEIR for its proposed Sunset sign. We disagree.

The determination of whether an SEIR was required with respect to Eller's proposal to construct a billboard at the Sunset site requires an examination of Public Resources Code section 21166. It provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which

---

[3] We do not intend by anything we say to hold that Eller's proposed billboards in fact comply with the Los Angeles Municipal Code. That issue is not before us.

wäs not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (See also Cal. Code Regs., tit. 14, § 15162.[4])

Section 15162 of the Guidelines, which pertains to subsequent EIR's and negative declarations, expounds that the "new information" must be "of substantial importance" and must be information that "was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete." (Subd. (a)(3).) In addition, the "new information" must show one of the following: "(A) The project will have one or more significant effects not discussed in the previous EIR . . . ; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (Subd. (a)(3).) A supplement to an EIR may be prepared in lieu of a subsequent EIR if "[a]ny of the conditions described in Section 15162 would require the preparation of a subsequent EIR" and "[o]nly minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation." (Guidelines, § 15163, subd. (a)(2); accord, *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1800 [16 Cal.Rptr.2d 358].)

As stated in *Fund for Environmental Defense v. County of Orange, supra,* 204 Cal.App.3d at page 1544, "An EIR is required in the first instance whenever a project 'may have a significant effect on the environment.' (§ 21151.) On the other hand, a subsequent or supplemental EIR is prepared under section 21166 only where it is necessary to explore the environmental ramifications of a substantial change not considered in the original EIR. ([Guidelines], § 15162, subds. (a)(1) & (2); *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 265 [232

[4]CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)) exist to aid state and local agencies in the implementation of CEQA. (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 478, fn. 6 [98 Cal.Rptr.2d 202]; *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1544, fn. 4 [252 Cal.Rptr. 79].) Courts are to afford the Guidelines great weight except when a particular provision is unauthorized or wrong under CEQA. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

Cal.Rptr. 772].) ▮ As was said in *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065 at pages 1073-1074 [230 Cal.Rptr. 413], '[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have changed enough to justify repeating a substantial portion of the process. Thus, while section 21151 is intended to create a "low threshold requirement for preparation of an EIR" [citation], [section 21166] indicates a quite different intent, namely, to restrict the powers of agencies "by prohibiting [them] from requiring a subsequent or supplemental environmental impact report" unless the stated conditions are met. [Citation.]' " (Italics omitted.)

▮ Following the submission of Eller's permit application for its proposed Sunset site, the CRA prepared the Initial Study "[b]ecause the program EIR did not consider the proposed Billboard in specific detail." CRA staff sought "to determine whether the construction and operation of the proposed Billboard may have a significant effect on the environment."

According to the Initial Study, the proposed site for Eller's Sunset billboard "is located on a parcel containing a building with one- and two-story elements, and approximately 22 feet in height, located at 6601-6613 Sunset Boulevard on the northeast corner of Sunset Boulevard and Cassil Place." "The parcel proposed as the site for the Billboard has approximately 143 feet of frontage along Sunset Boulevard and 55 feet of frontage along Cassil Place. The structure, built in 1928, is designed in the Spanish Churriguer-esque-style of architecture, which is known for its juxtaposition of flat wall surfaces and intricate and elaborate ornamental details in high relief. The building has been identified as Potentially Eligible for listing on the National Register of Historic Places based on a historic survey of the property conducted in 1979 as part of the . . . Plan adoption process." The Sunset site is located in an area of Sunset Boulevard "that contains a concentration of historic structures built in the late 1920's. . . . The historic survey for the . . . Plan identifies this grouping of ornate, Spanish-style building, as 'one of the best examples of Spanish style commercial architecture in Hollywood' and the Hollywood Plan map designates it as a 'potentially significant neighborhood'."

The proposed billboard at the Sunset site "would consist of a single pole, approximately four feet in diameter, anchored in a surface parking lot at the rear of the property. The pole would support a billboard-style sign with an advertising panel area of approximately 672 square feet that would extend over the existing historically designated building located at the front of the parcel. The proposed Billboard would be single faced with advertising copy

oriented toward the west. The dimensions of the advertising panel of the proposed Billboard would be 14 feet tall by 48 feet long. The height to the top of the proposed Billboard would be 52 feet above grade. The separation between the bottom of the proposed Billboard and the top of the existing building would be approximately 16 feet."

The Initial Study deemed an SEIR necessary.[5] Among other things, it specified that the final EIR for the Hollywood Redevelopment Project did not address issues pertaining to billboards and their potential impact on "the visual, aesthetic, and historic environment," "adjacent land uses such as religious facilities, schools, and the residences," and "scenic highways in the . . . Project Area." The Initial Study further voiced concern that the proposed billboard "would increase the number of light sources in the area, which could affect nearby buildings." It noted, however, that "[t]he impact of light and potential glare" should be analyzed and addressed in the SEIR and mitigation recommended.

Following the Initial Study, CRA advised the Sunset billboard applicant that certain possible significant adverse impacts had been identified. They were identified as follows: "[c]onflicts with applicable plans or policies adopted by agencies with jurisdiction over the project," "[i]ncompatibility with existing land uses in the vicinity," "[a]esthetic affects on a scenic vista or scenic highway," "[h]as a demonstrable negative aesthetic effect," "[a]ffects an historic resource," and "[i]ndividually limited but cumulatively considerable."

CRA further advised the applicant that the "[c]onstruction and operation of the proposed Billboard amounts to new information of substantial importance showing one or more significant effects not discussed in the Final [EIR] for the Hollywood Redevelopment Project which was certified in January 1986 [SCH No. 85052903]. Additionally, approval of this proposal would amount to a substantial change in the manner in which the Hollywood Redevelopment Project would be implemented by adversely affecting a building or resource determined by the Agency to be architecturally or historically significant." Accordingly, it was not possible for the CRA to act on Eller's proposal until the completion and certification of a Supplemental EIR that "analyze[d] in further detail the potential impacts identified," "examine[d] alternatives to the proposed Billboard" and "determine[d]

---

[5]The planner performing the Initial Study found "that THERE IS ADDITIONAL INFORMATION for the proposed project with respect to environmental conditions, impacts, mitigation measures or alternatives identified in the prior environmental impact report. Only minor additions or changes will be necessary to make the previous EIR adequately apply to the project in the changed situation and a SUPPLEMENT TO THE EIR will be prepared."

whether or not there is evidence to support a Statement of Overriding Considerations to address significant impacts that cannot be mitigated to less than significant levels."

Eller challenges CRA's determination that Eller's proposal to build a billboard at the Sunset site amounts to new information of substantial importance warranting an SEIR. This challenge is without substance. Although the Plan makes explicit reference to signs and billboards, the final program EIR for the project, which was certified in January 1986, is totally silent on the subject. Eller's assertion that the final EIR thoroughly analyzed the impact of billboards in the Project Area therefore cannot be substantiated. Eller does not convince us otherwise by its reference to the many general provisions of the final EIR discussing the negative impact development in the Project Area might have on historical and cultural resources, aesthetics and visual concerns, as well as mitigation.[6]

An EIR for a redevelopment project is known as a program EIR. (Guidelines, § 15180, subd. (b).) A program EIR is designed to analyze environmental impacts of a series of related actions that can be characterized as one large project. (Guidelines, § 15168, subd. (a).) That CEQA contains provisions for subsequent and supplemental EIR's reflects the Legislature's recognition that the need for environmental review may arise after the certification of a final EIR and the adoption of the redevelopment plan to which it relates. Indeed, the final EIR for the project explicitly stated that future review would be required: "The project would have significant unavoidable adverse effects on . . . historical resources. In addition, the individual development projects may have site-specific or project-specific impacts that are significant and unavoidable; these impacts cannot be identified at this time, but would be subject to additional environmental review."

Eller's proposal to construct a billboard at the Sunset site, which was submitted 13 years after the final EIR was certified and the Plan was adopted, is an individual site-specific development project within the Project Area whose specific impacts could not possibly have been identified at the time the final EIR was certified. Accordingly, CRA correctly determined that this proposed construction was "new information" that was not known and could not have been known at the time the final EIR was certified as complete. (Pub. Resources Code, § 21166; see also Guidelines, § 15162.) In

[6]*Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793 [88 Cal.Rptr.2d 455], *Bowman v. City of Petaluma, supra,* 185 Cal.App.3d 1065, *Fund for Environmental Defense v. County of Orange, supra,* 204 Cal.App.3d 1538, and *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029], on which Eller relies in support of its assertion that there is no new information of substantial importance, do not compel a contrary conclusion.

addition, the "new information" potentially would have one or more significant effects not discussed in the previous EIR. (Guidelines, §§ 15162, subd. (a)(3)(A), 15064.5, subd. (b) ["A project with an effect that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment"].) CRA's determination that a SEIR was required is unassailable.[7]

III

■ Eller contends the Initial Study prepared for the proposed billboards did not conform to Guidelines and requires it to comply with nonexistent standards. Any impropriety in this regard does not warrant reversal of the judgment, however.

A lead agency responsible for compliance with CEQA must complete its Initial Study within 30 days after it has accepted an application as complete. (Guidelines, §§ 15000, 15102.) In this case, CRA failed to meet this deadline. The time limits of CEQA are directory rather than mandatory, however. (*Eller Media Co. v. City of Los Angeles* (2001) 87 Cal.App.4th 1217, 1221 [105 Cal.Rptr.2d 262]; *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1440-1441 [91 Cal.Rptr.2d 322].) Eller acknowledges that the law provides no specific sanction for CRA's failure to comply with this time deadline. It also has cited no case holding that CRA's failure to comply with the time limitations of an initial study absolved it of its responsibility to comply with CEQA or entitled Eller to automatic approval of his building permit application. Simply stated, despite its failure to meet the CEQA deadline for its Initial Study, the CRA was obligated to complete the environmental process.

Eller next asserts that the Initial Study required it to comply with nonexistent standards. The initial studies for both billboard sites state, in part, that Eller's proposal is inconsistent with goal 5 of the Plan, which refers to the promotion of "sign and billboard standards." Eller maintains that inasmuch as the CRA had not yet adopted additional sign and billboard standards, "an environmental determination has been made that the Eller

---

[7] As CRA correctly points out, "Eller did not challenge any of the factual statements contained in the Initial Study. Eller did not dispute that the proposed billboard would be located both (i) on a Major Scenic Highway and (ii) on property identified as Eligible for Listing on the National Register of Historic Places. Eller did not challenge the Agency's determination that the size and scale of the proposed structure is incongruous with the surrounding historic structures or that it would impact negatively on the aesthetics of the area. Further, Eller did not contend that there exist measures which would mitigate these impacts to a level of 'less-than-significant,' or that Eller suggested measures which were ignored by the Agency."

signs to do not comply with certain nonexistent design standards and guidelines." Stated otherwise, Eller posits that CRA's findings that its proposals are inconsistent with goal 5 is nonsensical, in that its proposals cannot be inconsistent with sign and billboard standards that did not exist at that time. While this argument has appeal, Eller does not suggest a remedy, let alone cite any authority. In any event, the Plan still contains general provisions against which Eller's project was measured to determine if an SEIR was warranted.

Eller argues that evidence presented to the Board of Commissioners demonstrated that within the 20 months prior to the hearing, at least eight permits were issued for billboards in close proximity to historic sites. Even if this were true, Eller makes no showing why this fact alone entitled it to approval of its particular permits.

■ Finally, to the extent that Eller's brief reference to commercial free speech rises to the level of a concrete contention on appeal, we reject Eller's suggestion that this case involves the regulation of commercial speech and raises constitutional concerns regarding free speech. It does not. Eller has made no showing that CRA staff's ultimate decision to deny the permit applications was based upon the content of the proposed billboards or was the result of an exercise of unbridled discretion.

IV

■ Eller argues that the City of Los Angeles, not CRA, is the appropriate lead agency responsible for making environmental determinations. We disagree. With respect to projects in the Project Area, CRA is the lead agency. (*A Local & Regional Monitor v. City of Los Angeles, supra*, 12 Cal.App.4th at p. 1782; Health & Saf. Code, § 33372 ["Upon the filing of the ordinance adopting the redevelopment plan with the clerk or other appropriate officer of the legislative body, a copy of the ordinance shall be sent to the [redevelopment] agency, and the [redevelopment] agency is vested with the responsibility for carrying out the plan"]; *id.*, § 33003 ["'Agency' means a redevelopment agency created by this part or its predecessor, or a legislative body which has elected to exercise the powers granted to an agency by this part"]; Pub. Resources Code, § 21067 ["'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment"]; Guidelines, § 15367 ["'Lead Agency' means the public agency which has the principal responsibility for carrying out or approving a project. The lead agency will decide whether an EIR or negative declaration will be required for the project and will cause the document to be prepared. . . ."]; *id.*, § 15051 ["Where two or more public agencies will be

involved with a project, the determination of which agency will be the lead agency shall be governed by the following criteria: [¶] (a) If the project will be carried out by a public agency, that agency shall be the lead agency even if the project would be located within the jurisdiction of another public agency. [¶] (b) If the project is to be carried out by a nongovernmental person or entity, the lead agency shall be the public agency with the greatest responsibility for supervising or approving the project as a whole. . . ."].)

That the city has the ultimate responsibility for issuing building permits does not make the city the lead agency. Section 504 of the Plan states in no uncertain terms that "[n]o zoning variance, conditional use permit, building permit, demolition permit or other land development entitlement shall be issued in the Project Area from the date of adoption of this Plan unless and until the application therefor has been reviewed by the Agency and determined to be in conformance with the Plan and any applicable Design for Development. The Agency shall develop procedures for the expedited review of said applications." In accordance with its duty to ensure compliance with CEQA, the CRA therefore has the ultimate say as to whether a building permit is to be issued in the Project Area and is the lead agency for building activities within the Project Area.

The judgment is affirmed.

Ortega, J., and Mallano, J., concurred.