[No. D055350. Fourth Dist., Div. One. June 29, 2010.]

In re TOBACCO CASES I

**COUNSEL**

Wright & L'Estrange, Robert C. Wright, Joseph T. Ergastolo, Alexander T. Gruft; Jones Day and Noel J. Francisco for Defendant and Appellant R.J. Reynolds Tobacco Company.

Edmund G. Brown, Jr., Attorney General, Dennis Eckhart, Assistant Attorney General, and Jeanne Finberg, Deputy Attorney General, for Plaintiff and Respondent The People.

**OPINION**

**McCONNELL, P. J.**—Defendant, R.J. Reynolds Tobacco Company (Reynolds), appeals an order in favor of plaintiff, the People of the State of California, on the People's motion for an order to enforce a consent decree (Consent Decree) entered on a master settlement agreement (MSA). Reynolds contends the trial court erred by finding that certain images it used in an advertising campaign referred to as "Camel Farm" were "cartoons" as that term is defined in the MSA. Reynolds also contends the court erred by determining it has authority to assess sanctions against it for violating the MSA and the Consent Decree by using cartoons in its advertising. On the first point, we conclude the images in question are cartoons within the meaning of the MSA. We are not required to reach the second point because the court did not actually assess any sanctions against Reynolds, and thus it is not aggrieved by the ruling. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In November 1998 the largest tobacco companies in the United States, including Reynolds, entered into the MSA with 46 states, including California,

and the District of Columbia, to resolve claims against the tobacco companies pertaining to public health and the marketing of tobacco products to minors through cartoons and other means. Further, the People and Reynolds stipulated to the entry of the Consent Decree and a final judgment. As part of the Consent Decree, the Superior Court of San Diego County approved the MSA and retained exclusive jurisdiction over its implementation and enforcement.

The MSA prohibits the use of "cartoons" in the advertising, promoting, packaging or labeling of tobacco products. The MSA defines the term "cartoon" as "any drawing or other *depiction of an object*, person, animal, creature or any similar caricature *that satisfies any of the following criteria*: [¶] (1) the use of comically exaggerated features; [¶] (2) the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique; or [¶] (3) *the attribution of unnatural* or extrahuman *abilities*, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation." (Italics added.) The Consent Decree enjoins Reynolds from using "cartoons" in the advertisement or promotion of cigarettes.

In the second half of 2006, Reynolds launched its "Camel Farm" advertising campaign to promote the sale of Camel cigarettes to adult smokers who enjoy rock music performed by artists on independent labels. Reynolds used the Camel Farm campaign in various media, including special advertisements in publications, a promotional compact disc (CD) and a Web site (<www.thefarmrocks.com>).

As part of the Camel Farm campaign, Reynolds placed a four-page "gatefold" advertisement in the November 15, 2007, 40th anniversary edition of Rolling Stone magazine. The pages consisted of photographic collages, or photomontages, of such objects as a red tractor with film reels for wheels, which appears to be floating on air; radios, speakers and a television set that appear to be growing out of the ground on plant stalks; and a flying radio with helicopter rotors. The advertisement states such things as Reynolds is "Committed to Supporting & Promoting Independent Record Labels," and "The Best Music Rises from the Underground." (Some capitalization omitted.)

The four advertisement pages essentially bracketed five pages of Rolling Stone's editorial content, titled "Indie Rock Universe." (Some capitalization omitted.) Rolling Stone created the editorial pages, which consisted of hand-drawn illustrations of such things as a "rocket-powered guitar, a guitar-playing robot, a planet with a human mouth containing human-like teeth." There is no dispute that the images on the editorial pages were cartoons under

any definition. Before the November 15 issue of Rolling Stone was printed, Reynolds was unaware of the content of the editorial pages.

In December 2007 the People commenced this enforcement action against Reynolds. The action focused primarily on the November 15 issue of Rolling Stone magazine. It alleged the Camel Farm images in Reynolds's advertisement were "cartoons" within the meaning of the MSA, and further, Reynolds violated the MSA because its advertisement was adjacent to Rolling Stone's editorial pages, which were covered with cartoons. The action alleged the "average person looking at these pages would assume that the nine pages are an integrated whole, that together they are advertising Camel cigarettes." The action also objected to Camel Farm imagery appearing in other media, such as on Reynolds's Web site, including the image of a flying tractor with jet propulsion engines.

The action sought injunctive and declaratory relief, as well as monetary sanctions based on the number of MSA violations that occurred in California. After suit was filed, Reynolds voluntarily suspended the Camel Farm campaign pending resolution of the suit, and it instituted "new [media] insertion guidelines to avoid future adjacency of its ads to cartoons."

After an evidentiary hearing, the court determined Reynolds was not responsible for Rolling Stone's editorial pages, or for the adjacency of the Camel Farm advertisement to the editorial pages. The court explained the MSA prohibits Reynolds from actively "using" cartoons or "causing" others to use cartoons.[1]

As to the Camel Farm advertisement in Rolling Stone, the court found that a few of the images fit the MSA's definition of "cartoon." The court cited (1) "jet-powered tractors which fly," (2) "radios flying by means of attached helicopter rotors," (3) "televisions that grow on plant stems," and (4) tractors "with wheels made of film reels able to defy gravity." The court found injunctive and declaratory relief unnecessary, however, because Reynolds had already terminated the Camel Farm campaign, the MSA and Consent Decree already prohibit the use of cartoons in advertising, and Reynolds had taken steps to avoid the future adjacency of its advertising to cartoons.

Further, the court determined it had discretion under the terms of the Consent Decree to assess monetary sanctions against Reynolds for using

---

[1] The People did not appeal the court's ruling, and thus the court's finding on the adjacency issue stands.

cartoons in its advertising. The court, however, declined to assess any sanctions because it found Reynolds's violation of the ban on cartoons was unintentional and "in no way reprehensible"; the People stipulated there was no proof of the amount of actual damage on which to base a sanctions award; and it would be difficult to quantify the number of persons exposed to the Camel Farm campaign.

## DISCUSSION

## I

### Contract Interpretation

### A

Reynolds contends the court misinterpreted the MSA's definition of "cartoon" to include the above cited images from its Camel Farm advertising campaign.

█ Settlement agreements and consent judgments are construed under the same rules that apply to any other contract. (*Roden v. Bergen Brunswig Corp.* (2003) 107 Cal.App.4th 620, 624 [132 Cal.Rptr.2d 549]; *Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 686 [22 Cal.Rptr.2d 807, 23 Cal.Rptr.2d 807].) "Contract interpretation presents a question of law which this court determines independently. [Citations.] [¶] █ A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone." (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 472–473 [47 Cal.Rptr.2d 12].) "[T]he parties' expressed objective intent, not their unexpressed subjective intent, governs." (*Vaillette v. Fireman's Fund Ins. Co., supra*, at p. 686.)

Again, the MSA's definition of "cartoon" is "any drawing or other *depiction of an object*, person, animal, creature or any similar caricature *that satisfies any of the following criteria*: [¶] (1) the use of comically exaggerated features; [¶] (2) the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique; or [¶] (3) *the attribution of unnatural* or extrahuman *abilities*, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation." (Italics added.)

Reynolds contends the court erred by finding that under the unambiguous terms of the MSA, the term "cartoon" includes a depiction of any object with the attribution of unnatural abilities. Reynolds relies on the maxim of construction *ejusdem generis*, under which " 'the enumeration of specific items or factors will be controlling over general statements placed before or after the list of specific items or factors. [Citation.] In other words, "the general term or category is 'restricted to those things that are similar to those which are enumerated specifically.' " [Citation.]' " (*Eller Media Co. v. Community Redevelopment Agency* (2003) 108 Cal.App.4th 25, 38 [133 Cal.Rptr.2d 324]; see *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1045, fn. 4 [72 Cal.Rptr.3d 210] [maxim applies to both legislation and contracts].)

The maxim of *ejusdem generis* "is an aid to be used if the language is ambiguous." (*The Zumbrun Law Firm v. California Legislature* (2008) 165 Cal.App.4th 1603, 1619 [82 Cal.Rptr.3d 525].) A contract is ambiguous only if it is reasonably susceptible of two or more interpretations. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 524 [132 Cal.Rptr.2d 151].)

Reynolds argues the MSA's definition of "cartoon" is ambiguous, and under the maxim of *ejusdem generis*, the general term "unnatural . . . abilities" in the third criterion of the MSA's definition of "cartoon" is modified by the phrase "such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation." Reynolds asserts these examples "are *all* examples of *super-hero-like powers* that are particularly appealing to children, rather than merely unusual or surrealist depictions." (Italics added.) Reynolds submits that the MSA must be interpreted to mean the "unnatural . . . abilities" language "cover[s] only super-hero-like powers."

We conclude the MSA is not susceptible of the interpretation Reynolds urges, and thus the *ejusdem generis* maxim is inapplicable. Inanimate objects cannot be portrayed with "super-hero-like" abilities such as imperviousness to pain and X-ray vision. Reynolds argues that objects can have "super-hero-like" abilities, citing the supposed examples of "Aladdin's magic carpet and the Wicked Witch of the West's flying broomstick." Carpets and broomsticks, however, cannot be depicted as acting heroically even when they are defying the rules of gravity. The word "hero" denotes human attributes such as courage and principle. (See Webster's 3d New Internat. Dict. (1993) p. 1060.) An object can be depicted as having "super-hero-like" powers only if human

characteristics are attributed to the object, which would violate the second criterion of the MSA's definition of the term "cartoon."[2]

■ In plain terms, the MSA's definition of "cartoon" includes the depiction of an object with unnatural abilities. The object need not, and indeed cannot, be depicted as possessing super-hero-like or super-human qualities. Under Reynolds's analysis, the term "object" would be immaterial insofar as the third criterion of the definition is concerned. We must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage. (*Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1602 [49 Cal.Rptr.2d 302].)

■ Further, the court correctly determined that certain depictions in the Camel Farm campaign were "cartoons" within the meaning of the MSA. The term "unnatural" is defined as "not being in accordance with nature," "not . . . consistent with a normal course of events," "inconsistent with what is natural or expected," and "going beyond what is normal." (Webster's 3d New Internat. Dict., *supra*, at p. 2504.) Flying radios with helicopter rotors, flying jet-propelled tractors, and radios and televisions growing out of the ground on plant stalks have unnatural abilities. The cartoon nature of the images is highlighted if we imagine them as hand drawn; the analysis should not change because they appear in photomontages.

As the Washington State Court of Appeals noted in similar litigation: "[I]t is plain that one focus of the MSA is to prohibit the marketing of tobacco products by the use of unnatural images. The Camel Farm imagery depends entirely upon suspension of the laws of nature. Under a blue sky in a pastoral Eden, roosters hitch rides on floating tractors, speakers grow out of the ground, and radios fly. This is in a world where the natural laws do not obtain, where cancer and serious health problems can cease to exist. For a product known to cause both, such a world is a potent sales device." (*State of Washington v. R.J. Reynolds Tobacco Co.* (2009) 151 Wn.App. 775 [211 P.3d 448, 452–453].)[3]

---

[2] Reynolds claims that while objects can have "super-hero-like" powers, the Camel Farm images did not display such powers because the tractors and radios "have the ability to fly based upon propellers and engines, rather than supernatural forces." We are not required to address this claim.

[3] We grant Reynolds's unopposed requests for judicial notice of the Washington opinion and other out-of-state rulings in parallel litigation over the Camel Farm advertising campaign. (Evid. Code, § 452, subd. (a); see *Commonwealth of Pennsylvania v. Philip Morris, Inc.* (May 12, 2009, Philadelphia Co., Pa.C.P.Ct. No. 2443) ["any reasonable person viewing the images of the advertising . . . would conclude that these images were or included cartoons"]; *State of Ohio ex rel. Cordray v. R.J. Reynolds Tobacco Co.* (Ct.App. 2010) 2010 Ohio 86 [trial court found advertising contained cartoons; ruling not appealed and appellate court presented with different

Further, while the court determined Reynolds did not intend to violate the MSA by targeting youth in the Camel Farm campaign, we conclude the campaign's fanciful imagery would appeal to youth. We note that Reynolds and other tobacco companies have a history of targeting youth in their advertising while professing ignorance of wrongdoing. In May 2006, following seven years of litigation and a nine-month trial, United States District Court Judge Gladys Kessler issued a landmark decision in favor of the government in its RICO (Racketeer Influenced and Corrupt Organizations Act; 18 U.S.C. § 1961 et seq.) litigation against several tobacco companies, including Reynolds, based in part on the targeting of youth in advertising. (*U.S. v. Philip Morris USA, Inc.* (D.D.C. 2006) 449 F.Supp.2d 1 (*Philip Morris I*), affirmed in relevant part in *U.S. v. Philip Morris USA, Inc.* (D.C. Cir. 2009) 386 U.S. App.D.C. 49 [566 F.3d 1095, 1105–1106, 1108, 1118] (*Philip Morris II*); see *Grisham v. Philip Morris, Inc.* (C.D.Cal. 2009) 670 F.Supp.2d 1014, 1030.) Judge Kessler found "the overwhelming evidence . . . prove[s] that, historically, as well as currently, Defendants do market to young people, including those under twenty-one, as well as those under eighteen. Defendants' marketing activities are intended to bring new, young, and hopefully long-lived smokers into the market in order to replace those who die (largely from tobacco-caused illnesses) or quit. Defendants intensively researched and tracked young people's attitudes, preferences, and habits. As a result of those investigations, Defendants knew that youth were highly susceptible to marketing and advertising appeals, would underestimate the health risks and effects of smoking, would overestimate their ability to stop smoking, and were price sensitive. Defendants used their knowledge of young people to create highly sophisticated and appealing marketing campaigns targeted to lure them into starting smoking and later becoming nicotine addicts." (*Philip Morris I, supra*, at p. 691; see also *Philip Morris II, supra*, 566 F.3d at p. 1134.) Judge Kessler concluded the "evidence is clear and convincing—and beyond any reasonable doubt—that Defendants have marketed to young people . . . while consistently, publicly, and falsely, denying they do so." (*Philip Morris I, supra*, at p. 691.)

B

Reynolds argues that since the MSA's definition of "cartoon" is ambiguous, we must narrowly construe it to protect Reynolds's First Amendment free speech rights. As discussed, however, we find the definition unambiguous. We also note that Reynolds raised essentially the same argument in *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra*, 107 Cal.App.4th

issue]; *State of Illinois v. Philip Morris* (Sept. 3, 2008, Ill., Cook Co.Cir.Ct. No. 96 L 13146) [court found no cartoons]; *State of Maine ex rel. Rose v. R.J. Reynolds Tobacco Co.* (Jan. 21, 2009, Me., Kennebec Co. Super.Ct. No. CV-97-134) [court found no cartoons].) We simply disagree with courts that have found in Reynolds's favor on the cartoon issue.

at pages 531–533, pertaining to a different provision of the MSA, and this court rejected it on the ground that in section XV of the MSA Reynolds expressly waived its right to contest its provisions as unconstitutional.[4] We disagreed with Reynolds's argument "there was an exception to such waiver if an express restriction/limitation in the MSA were construed contrary to Reynolds's pr[o]ferred interpretation." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra*, 107 Cal.App.4th at p. 533.) We explained that "even if a restriction/limitation in the disputed express provisions of the MSA were construed contrary to Reynolds's preferred interpretation, those express contractual terms remained express provisions subject to Reynolds's knowing and intentional waiver of the right to contest their constitutionality. Accordingly, Reynolds's claims based upon the alleged violation of its commercial speech rights are unavailing." (*Ibid.*; see also *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1267 [11 Cal.Rptr.3d 317].)

■ Further, while the opinions of Reynolds's advertising agency, its employees and an expert witness on the MSA's definition of "cartoon" may have been relevant to the issue of whether Reynolds's violation of the ban on cartoons was intentional, the interpretation of contractual language is a legal matter for the court. Reynolds is not the arbiter of its conduct, and "[e]xpert opinion on contract interpretation is usually inadmissible." (*Schaffter v. Creative Capital Leasing Group, LLC* (2008) 166 Cal.App.4th 745, 752, fn. 2 [83 Cal.Rptr.3d 19].)

Reynolds also submits that course of performance evidence shows the Camel Farm advertising images are not "cartoons" within the meaning of the MSA. Reynolds relies on evidence the Camel Farm imagery first came to the attention of the Attorney General's office on August 1, 2007, and several settling states, including California, met with Reynolds representatives in October 2007 to discuss concerns about the Camel Farm campaign, but no issue was raised pertaining to the use of cartoons. Reynolds argues that by not raising the issue before filing suit in December 2007, shortly after

---

[4] Section XV of the MSA provides in relevant part: "Each Participating Manufacturer further acknowledges that it understands that certain provisions of this Agreement may require it to act or refrain from acting in a manner that could otherwise give rise to state or federal constitutional challenges and that, by voluntarily consenting to this Agreement, it . . . waives for purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions. Provided, however, that nothing in the foregoing shall constitute a waiver as to the entry of any court order (or any interpretation thereof) that would operate to limit the exercise of any constitutional right except to the extent of the restrictions, limitations or obligations expressly agreed to in this Agreement or the Consent Decree."

publication of the Rolling Stone issue in question, the People essentially acquiesced to the legality of the Camel Farm imagery.

■ "The rationale for the admission of course of performance evidence is a practical one. '[W]hen a contract *is ambiguous,* a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. [Citation.] The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention.' " (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 921 [74 Cal.Rptr.3d 733], italics added.) "Extrinsic evidence can be offered not only 'where it is obvious that a contract term is ambiguous, but also to expose a latent ambiguity.' [Citation.] Such evidence is admissible when ' "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." ' " (*Id.* at p. 920.) Here, as discussed, the MSA's definition of the term "cartoon" is not susceptible of the interpretation Reynolds urges. Accordingly, we do not consider course of performance evidence.

## II

### *Sanctions*

Section VI(A) of the Consent Decree provides that the People may "seek an order for monetary, civil contempt or criminal sanctions of any claimed violations," and section VI(E) of the Consent Decree provides for cumulative remedies "in addition to any other remedies the State of California may have at law or equity."[5] In *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra,* 116 Cal.App.4th 1253, 1283, also a civil action to enforce the MSA and Consent Decree, Reynolds agreed at the trial court that "the Consent

---

[5] Section VI(A) of the Consent Decree also provides: "For any claimed violation of this Consent Decree and Final Judgment, in determining whether to seek an order for monetary, civil contempt or criminal sanctions for any claimed violation, the Attorney General shall give good-faith consideration to whether: (1) the Participating Manufacturer that is claimed to have committed the violation has taken appropriate and reasonable steps to cause the claimed violation to be cured, unless that party has been guilty of a pattern of violations of like nature; and (2) a legitimate, good-faith dispute exists as to the meaning of the terms in question of this Consent Decree and Final Judgment. The Court in any case in its discretion may determine not to enter an order for monetary, civil contempt or criminal sanctions."

Decree entitled the People to seek monetary sanctions for violation of the Consent Decree." We concluded the People were entitled to sanctions for Reynolds's violation of the MSA and Consent Decree by targeting youth in its advertising, but remanded the matter for a new hearing on the amount of sanctions. (*Id.* at pp. 1286–1291.)

Reynolds now contends the Consent Decree does not authorize the imposition of sanctions in a civil proceeding and the trial court erred by finding otherwise. Reynolds argues that only compensatory damages may be awarded in a civil enforcement action; sanctions can be assessed only in a criminal proceeding, and any agreement to the contrary in the MSA is void and unenforceable.

The matter is moot, however, because the court exercised its discretion under the Consent Decree *not* to assess any sanctions against Reynolds. Contrary to Reynolds's assertion, the court's finding on the legal basis for sanctions was not a subject of binding declaratory relief. The court's statement of decision discusses the legality of monetary sanctions, but as to declaratory relief merely provides, "Aside from the clarification of the definition of cartoon contained in this decision, further declaratory relief is not required."

Only aggrieved parties may appeal. (Code Civ. Proc., § 902.) "One who is not aggrieved by a decision of the lower court has no right of appeal therefrom." (*People v. West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462, 467 [89 Cal.Rptr. 290]; see *Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596, 1611 [66 Cal.Rptr.3d 872].) Since Reynolds was not aggrieved by the court's denial of sanctions, and there was no declaratory relief on the legal basis for sanctions, no actual relief is available on appeal. Further, whether the legality of sanctions will arise anew in a subsequent civil enforcement action is speculation, and even if it is a certainty, as the parties seem to agree, resolution of the issue can wait for a live controversy. Under the circumstances, we decline to use limited court resources to issue an opinion that would be in the nature of an advisory opinion. (See *Salazar v. Eastin* (1995) 9 Cal.4th 836, 860 [39 Cal.Rptr.2d 21, 890 P.2d 43].)[6]

---

[6] We asked the parties for supplemental briefing on the mootness issue and have taken their responses into consideration. We are unpersuaded by Reynolds's assertion we should exercise our discretion to reach the sanctions issue even though it is moot because a ruling against the People on the issue would cause them not to "rac[e] to the courthouse" whenever they perceive a possible violation of the MSA. The corollary argument is that such a finding would give Reynolds greater latitude to violate or push the limits of the MSA. As the trial court noted here, "Reynolds has been accused many times of violating the cartoon prohibition of the MSA/Consent Decree and has been held responsible for many violations of the public health provisions of the MSA regarding advertising."

## DISPOSITION

The order is affirmed. The People are entitled to costs on appeal.

Huffman, J., and McIntyre, J., concurred.

A petition for a rehearing was denied July 16, 2010.