**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
             *Plaintiff-Appellee,*

v.

EDEBITPAY, LLC; DALE PAUL
CLEVELAND; WILLIAM RICHARD
WILSON,

             *Defendants-Appellants.*

No. 11-55431

D.C. No.
2:07-cv-04880-
ODW-AJW

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
August 6, 2012—Pasadena, California

Filed August 28, 2012

Before: Stephen Reinhardt, Barry G. Silverman, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Silverman

## COUNSEL

Michael L. Mallow (argued) and Christine M. Reily of Loeb & Loeb LLP, Los Angeles, California, for the defendants-appellants.

Leslie R. Melman (argued), Willard K. Tom, John F. Daly, Burke Kappler, Mark Morelli, Elizabeth Tucci, and Zachary Hunter of the Federal Trade Commission, Washington, D.C., for the plaintiff-appellee.

## OPINION

SILVERMAN, Circuit Judge:

The Federal Trade Commission sued Defendants EDebit-Pay, LLC, Dale Cleveland, and William Wilson, alleging that their online marketing of prepaid debit cards and short-term loans to consumers in the subprime market violated section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The parties settled and stipulated to the terms of a Final Order. Thereafter, the FTC applied for an order to show cause why Defendants should not be held in contempt for violating the Final Order through their marketing of two products: a shopping club membership program and a "no cost" debit card. The district court held Defendants in contempt and awarded the FTC the full amount of loss by consumers, $3,778,315.04. We affirm the contempt order in its entirety.

## I.   *FACTUAL AND PROCEDURAL BACKGROUND*

EDebitPay markets online prepaid charge cards and related products. Cleveland and Wilson own EDebitPay and serve as its Chief Executive Officer and President, respectively.

The FTC filed suit, alleging that Defendants violated the Federal Trade Commission Act in several respects. Defendants and the FTC ultimately settled the matter and stipulated to the terms of a Final Order, which the district court approved.

The Final Order, in part, enjoins Defendants from:

***Subsection I.B***

Misrepresenting . . . expressly or by implication, any fact material to a consumer's decision to apply for or purchase any product or service . . . including but not limited to:

1. that consumers can obtain any product or service, including but not limited to a pre-paid card, debit card, or credit card, at no cost or obligation;

2. the amount of any fee, charge, or bill, including but not limited to the cost of any prepaid card, debit card, or credit card;

3. that a consumer will not be assessed a fee, or be charged or billed;

4. that a consumer is legally obligated to pay a fee, charge, or bill;

5. any material provision relating to the acquisition or purchase of a prepaid card, debit card, or credit card marketed or offered by any Defendant;

6. that consumers purchased or agreed to purchase goods or services, and therefore owe money to any Defendant;

. . .

***Subsection I.D***

Failing to clearly and conspicuously disclose the costs, fees, or charges to obtain and use any prepaid card, debit card, or credit card, in close proximity to

statements such as "No Annual Fees" or "No Security Deposit" that represent that a prepaid card, debit card, or credit card can be obtained "free"; [and]

. . .

***Subsection I.E.5***

Failing to clearly and conspicuously disclose[,] prior to the time when a consumer applies for or purchases any good or service . . . the material attributes of the product or service . . . e.g., that the product has the characteristics of a credit card, debit card, or stored value card.

The day before the district court signed the Final Order, Defendants started marketing "Century Platinum"—an online shopping club membership—on their "Super Elite" website (supereliteoffer.com) for a third party, Insite. Around this time, Defendants also used their "Starter Credit Direct" website (startercreditdirect.com) to advertise Century Platinum. Defendants used e-mail advertisements to target consumers and bring them to the websites.[1] The e-mail advertisements stated in large, bold font, "Get an Immediate Guaranteed $10,000 Credit Line*" above a large "APPLY NOW" button. They made no mention of "membership" or "shopping club." At the bottom of the e-mails, and in very small font, Defendants disclosed to consumers that the credit line could only be used at Insite's online store.

Once a consumer clicked on the "Apply Now" button, the Super Elite or Starter Credit Direct webpage opened. The

---

[1]Defendants argue that the e-mail advertisements should not be considered because they relate only to the Starter Credit Direct website, which is not at issue in this appeal. At trial, however, Defendants testified that these e-mail offers were used to bring consumers to both the Super Elite and Starter Credit Direct websites.

record shows that the two websites were essentially the same. On the first page, Defendants placed a $10,000 credit line offer in large, red, boldface font above "*Instant $2500 Account Advance*," "Guaranteed $10,000," "No Job Requirements," "No Credit Checks," and "100% Online Approval." The Super Elite webpage included the words "Century Platinum Membership Credit Line" in smaller point typeface below the $10,000 credit line offer.

After the consumer clicked on "GO TO APPLICATION," the consumer was taken to the second page, which was similar to the first page, except it contained additional boxes where the consumer could input his or her checking account information. Enrollment in Century Platinum entailed a $99 application and processing fee and a $14 monthly membership fee. The only reference to a shopping club was in a footnote at the bottom of the pages in 7.5-point, single-spaced type and in the middle of other dense footnotes. It stated, "To Purchase Brand Name Merchandise Exclusively From Our Online Mega-Store! . . . This is a membership program and not a debit or credit card."

Defendants enrolled around 34,340 consumers in Century Platinum, but only 86 people or less than 0.3% of the total enrolled attempted to place orders from the online shop. Defendants received thousands of complaints from consumers, many asking for refunds and explaining that they did not know they were joining a club. Nevertheless, Defendants did not change any part of their websites.

Two years after the district court entered the Final Order, Defendants began to advertise another product, the NetSpend "No Cost" prepaid debit card. Defendants marketed the card on behalf of NetSpend Corporation, a third-party, on at least three different websites (simplecreditmatch.com, eplatinumdirect.com, and supereliteoffer.com) that gave consumers the option of obtaining the card while they purchased other products, such as Century Platinum. Despite its name, the NetS-

pend card entailed a $9.95 monthly maintenance fee and various other fees.

The websites used the slogan, "Get a Prepaid Visa Debit Card at NO COST!—No Overdraft Fees or Interest Charges!" When a consumer clicked "Yes," a drop-down message appeared with a hyperlink to additional "*Terms & Conditions*." Defendants concede that, at various times, the websites failed to disclose any fees: Simple Credit Match (July 2009–February 2010); ePlatinum Direct (November 2009–January 2010); and Super Elite (June 2009–November 2009). At other times, they stated that "[a] monthly maintenance fee of $9.95 will be assessed." A consumer had to click the "*Terms & Conditions*" to find various fees in the middle of a 4,720-word document.

After learning of these practices, the FTC applied for an order to show cause why Defendants should not be held in contempt for violating the Final Order. The FTC alleged that Defendants violated subsections I.B and I.E.5 through their material misrepresentations and failure to clearly and conspicuously disclose material facts regarding Century Platinum on the Starter Credit Direct website. In addition, it argued that Defendants violated subsection I.D for failing to clearly and conspicuously disclose all fees relating to the NetSpend card.[2] Later, after it was discovered, the FTC expanded its contempt application to cover Defendants' marketing of Century Platinum on the Super Elite website.

After a three-day bench trial, the district court ruled that Defendants' advertising of Century Platinum was misleading and violated subsections I.B and I.E.5. The court also found

---

[2]The FTC also argued that Defendants violated other subsections of the Final Order by failing to obtain consumers' express consent to charges relating to Century Platinum and the NetSpend card. The district court concluded that the FTC failed to prove those violations, and the FTC does not appeal that adverse ruling.

that Defendants violated subsection I.D through their marketing of the NetSpend card. The district court awarded as sanctions the FTC the full amount of loss by consumers, $3,778,315.04.

Defendants appeal the district court's contempt order, but concede that the marketing on the Starter Credit Direct website violated the Final Order. As such, they appeal the contempt order only as it pertains to the marketing of Century Platinum on the Super Elite website and the NetSpend card.

## II.  *JURISDICTION AND STANDARD OF REVIEW*

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's civil contempt order for abuse of discretion. *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). The district court's underlying factual findings are reviewed for clear error, *id.*, but its construction of the consent decree is reviewed de novo, *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990).

## III.  *DISCUSSION*

### A.

Defendants argue that the district court erred when it failed to limit the reach of subsections I.B and I.E.5 to only prepaid cards, debit cards, and credit cards. Defendants also claim that the district court erred when it refused to consider extrinsic evidence supposedly bearing on the scope of subsection I.E.5.

[1] In construing consent decrees like the one at issue here, "courts use contract principles. The contract law of the situs state applies." *Thompson*, 915 F.2d at 1388 (internal citation omitted). In California, a contract is to be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. The contract's

language governs "if the language is clear and explicit." *Id.* § 1638.

**[2]** The district court correctly held that subsections I.B and I.E.5 are not limited to Defendants' marketing of credit cards, debit cards, or prepaid cards. The plain language of subsections I.B and I.E clearly and explicitly enjoins misrepresentations on, and failure to disclose material information about, "any product or service offered by any Defendant." Subsection I.B, moreover, states that its scope "includ[es] but [is] not limited to" certain enumerated examples. This "including but not limited to" language "is a phrase of enlargement." *In re Johnny M.*, 123 Cal. Rptr. 2d 316, 321 (Ct. App. 2002). It indicates an intention that enumerated examples following the phrase should not be construed as an exhaustive listing. *See LT-WR, L.L.C. v. Cal. Coastal Comm'n*, 60 Cal. Rptr. 3d 417, 443 (Ct. App. 2007). Similarly, for subsection I.E.5, the parties used the term "e.g." which means "for example." Black's Law Dictionary 593 (9th ed. 2009). "E.g." signifies that the subsequent examples are illustrative and not exhaustive. Defendants' interpretation would render the phrases "any good or service," "including but not limited to," and "e.g." inoperative or meaningless. *See* Cal. Civ. Code § 1641.

**[3]** Defendants' argument that the district court's construction violated *ejusdem generis* is unpersuasive. "Under the principle of *ejusdem generis* . . . where specific words follow general words in a contract, 'the general words are construed to embrace only things similar in nature to those enumerated by the specific words.' " *Nygard, Inc. v. Uusi-Kerttula*, 72 Cal. Rptr. 3d 210, 223 (Ct. App. 2008) (citations omitted). The maxim of *ejusdem generis*, however, is inapplicable where the contract language is unambiguous, as is the case here. *See In re Tobacco Cases I*, 111 Cal. Rptr. 3d 313, 318 (Ct. App. 2010). Because the language of the Final Order is clear, the district court also properly declined to evaluate extrinsic evidence regarding subsection I.E.5. *See Nehmer v.*

*U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007) ("[I]f the plain language of a consent decree is clear, we need not evaluate any extrinsic evidence . . . .").

**[4]** Defendants next argue that subsections I.B and I.E.5 are vague and overbroad if not restricted to credit, debit, and prepaid cards. They contend that the district court's interpretation renders the subsections unenforceable because they merely restate section 5 of the Federal Trade Commission Act and amount to "obey the law" injunctions.

Defendants' argument fails on multiple accounts. First, because they themselves stipulated to the entry of the Final Order, they cannot collaterally attack the Final Order in contempt proceedings. *See Irwin v. Mascott*, 370 F.3d 924, 931 (9th Cir. 2004). Second, we have not adopted a rule against "obey the law" injunctions per se. *See United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978). Third, Defendants' argument proves only that the Final Order is broad, not vague.

Defendants further contend that their marketing of Century Platinum on the Super Elite website did not violate subsections I.B and I.E.5, and that their marketing of the NetSpend card was a harmless technical violation of subsection I.D. In the alternative, Defendants argue that they should not be held in contempt because they substantially complied with the consent decree.

**[5]** The district court did not abuse its discretion in finding that Defendants' Super Elite website violated the Final Order. Defendants prominently displayed in large, bold, and colored type "$10,000" and "Instant $2,500 Advance," misrepresenting by implication that the offer was for a general credit line. In a much smaller font, Defendants used the ambiguous phrase "Century Platinum Membership Credit Line." This did not clearly and conspicuously disclose a material attribute of Century Platinum—that the credit line can *only* be used at a third-party's online shop. To fully understand the product,

consumers would have had to look at a small footnote buried in the middle of other dense footnotes. Therefore, the "net impression" of the marketing on the Super Elite website mis-led consumers and violated subsections I.B (misrepresentation) and I.E.5 (failure to disclose). *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).

**[6]** The district court similarly did not abuse its discretion in holding that Defendants' marketing of the NetSpend card violated subsection I.D. Defendants concede that at various times their websites failed to disclose, among other fees, a monthly $9.95 maintenance fee. This violation occurred for eight months on one of Defendants' websites. These were not mere "technical" violations and, thus, the district court's contempt finding was not an abuse of discretion.

Defendants' claim of substantial compliance is unavailing because a defendant must show that he took "every reasonable effort" to comply with the order to establish such a defense. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The district court did not clearly err or abuse its discretion in finding that not to be the case.

**B.**

Lastly, Defendants argue that the district court abused its discretion when it ordered them to pay the FTC the full amount lost by consumers. Defendants assert that the district court should have ordered them to disgorge only their profits instead.

**[7]** "District courts have broad equitable power to order appropriate relief in civil contempt proceedings." *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). Moreover, district courts have "broad authority" under the Federal Trade Commission Act to grant any relief necessary to accomplish complete justice in direct FTC actions, including the power to

order restitution to consumers. *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009). However, we have not had occasion to determine whether district courts have comparable broad authority to calculate sanctions in contempt proceedings brought by the FTC. The Seventh, Tenth, and Eleventh Circuits have expressly considered this issue and all have generally held that district courts may use consumer loss. *See FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009); *FTC v. Kuykendall*, 371 F.3d 745, 764 (10th Cir. 2004) (en banc); *McGregor v. Chierico*, 206 F.3d 1378, 1387–88 (11th Cir. 2000). We join our sister circuits today and hold that district courts have broad discretion to use consumer loss to calculate sanctions for civil contempt of an FTC consent order. In exercising this discretion, the district court should explain why the use of consumer loss is appropriate and why the remedy is commensurate with the harm.

**[8]** Here, the district court did not abuse its discretion when it sanctioned Defendants for the full amount lost by consumers. It sufficiently explained that full restitution, rather than only disgorgement, was appropriate because Defendants disregarded the core provisions of the Final Order to not mislead consumers about the products they advertised. The district court also found that consumers lost far more than Defendants gained. The record supports the district court's determination that Defendants took advantage of thousands of consumers, who lost over $3 million because of Defendants' acts. The district court's decision that equity required Defendants to make consumers whole again in light of these circumstances was not an abuse of discretion.

The district court's contempt order is AFFIRMED.