**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSHUA KELLY; JOSE PINA; ANDREW IBARRA; RAY BARRIOS; RANDY ENZMINGER; MICHAEL MIERA; PRISONER A; PRISONER F, Individually and on behalf of a class of all other persons similarly situated, <br><br> *Plaintiffs-Appellees*, <br><br> v. <br><br> TIMOTHY WENGLER; CORRECTIONS CORPORATION OF AMERICA, INC., <br> *Defendants-Appellants*. | Nos. 13-35972 <br> 14-35199 <br><br> D.C. Nos. <br> 1:11-cv-00185-EJL <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Idaho
David O. Carter, District Judge, Presiding

Argued and Submitted October 13, 2015
Seattle, Washington

Filed May 23, 2016

Before: William A. Fletcher and Raymond C. Fisher, Circuit Judges, and Claudia Wilken,[*] Senior District Judge.

Opinion by Judge W. Fletcher

## SUMMARY[**]

### Prisoner Civil Rights

The panel affirmed the district court's contempt order and its order awarding plaintiffs attorney's fees, which the district court entered after finding that defendants in the underlying putative class action, Timothy Wengler and the Corrections Corporation of America, Inc., had violated a settlement agreement.

In the underlying § 1983 action, plaintiffs alleged that defendants staffed the Idaho Corrections Center with an inadequate number of security guards, in deliberate indifference to the health and safety of prisoners. The parties settled, and defendants agreed to staff Idaho Corrections Center with a specified number of security personnel. After learning that staffing reports at Idaho Corrections Center had been falsified over a seven-month post-settlement period,

---

[*] The Honorable Claudia Wilken, Senior District Judge for the U.S. District Court for the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

plaintiffs moved the district court to hold defendants in contempt.

The panel held that defendants' non-compliance with the settlement agreement justified a finding of contempt. The panel held that defendants failed to take all reasonable steps that would have allowed it to discover that records had been falsified.

The panel held that the district court's ordered remedy – the extension of the settlement agreement for two years – was a compensatory civil sanction that returned plaintiffs to the position they would have occupied had defendants not violated the agreement from its inception. The modification of the settlement agreement was well within the court's inherent power and was narrowly drawn, necessary, and the least intrusive means to rectify defendants' continued Eighth Amendment violations.

Affirming the award of attorney's fees, the panel held that the Prison Litigation Reform Act allows enhancement of the lodestar figure in appropriate circumstances. While the Act limits the hours and the hourly rate used in calculating the lodestar figure, it does not cap the total amount of attorney's fees awards in cases seeking declaratory and injunctive relief, and it continues to authorize a court to enhance the lodestar figure based on non-subsumed factors. The panel concluded that in this case the district court provided clear reasons, supported by specific evidence in the record, for enhancing the lodestar figure.

**COUNSEL**

Nicholas D. Acedo (argued), Daniel P. Struck, Tara B. Zoellner, Struck Wienecke & Love, P.L.C., Chandler, Arizona, for Defendants-Appellants.

Stephen L. Pevar (argued), American Civil Liberties Union Foundation, Hartford, Connecticut; Richard Alan Eppink, American Civil Liberties Union of Idaho Foundation, Boise, Idaho, for Plaintiffs-Appellees.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Plaintiffs-Appellees ("Plaintiffs") brought a putative class action in the District of Idaho under 42 U.S.C. § 1983 against Defendants-Appellants Timothy Wengler and the Corrections Corporation of America, Inc. (collectively "CCA"), alleging that CCA staffed the Idaho Corrections Center ("ICC") with an inadequate number of security guards, in deliberate indifference to the health and safety of prisoners. The parties settled, and CCA agreed to staff ICC with a specified number of security personnel. The district court dismissed the case with prejudice, incorporating the parties' settlement agreement into its dismissal order.

After learning that staffing reports at ICC had been falsified over a seven-month post-settlement period, Plaintiffs moved the district court to hold CCA in contempt for violating the dismissal order. After a two-day hearing, the district court found CCA in contempt, ordered remedial measures, and awarded Plaintiffs attorney's fees and costs.

CCA challenges various aspects of the district court's orders, including the award of attorney's fees. We affirm.

## I. Background

### A. Initial Suit and Settlement

ICC is a state-owned prison in Kuna, Idaho. When this suit was filed in April 2011, CCA operated ICC under a contract with the Idaho Department of Corrections ("IDOC"). Plaintiffs' complaint alleged CCA failed to hire an adequate number of security guards and, as a result, ICC staff failed to protect inmates from assault by other inmates. The complaint alleged CCA was deliberately indifferent to the safety and health of ICC inmates in violation of the Eighth Amendment. Plaintiffs requested declaratory relief and an injunction ordering, inter alia, that CCA hire an adequate number of security personnel.

In September 2011, the parties met with a judicial mediator, District Judge David O. Carter of the Central District of California. They reached a settlement after three days of negotiation. In a signed settlement agreement, CCA agreed to comply with the staffing requirements contained in its contract with IDOC. CCA also agreed to provide three additional officers, known as the "Warden's Crew," whom the warden could use in his discretion to enhance security. The parties signed a stipulation for dismissal. The stipulation incorporated the settlement agreement, which was attached as an exhibit to the stipulation. District Judge Edward J. Lodge of the District of Idaho signed an order on September 20, 2011, dismissing the case with prejudice. His order explicitly incorporated the parties' stipulation.

## B.  Order to Show Cause

Between December 2012 and January 2013, CCA and IDOC received reports that staffing records at ICC had been falsified during the post-settlement period.  IDOC initiated an audit of ICC's staffing records, and CCA hired an investigator.  On April 11, 2013, IDOC issued a press release, stating that CCA's employees had falsified staffing records to represent that correctional officers were staffing mandatory security posts when, in fact, those posts had been vacant for a total of nearly 4,800 hours during a seven-month period in 2012.  That same day, CCA issued its own press release stating there were "some inaccuracies" in its staffing records.

In June 2013, Plaintiffs moved in the district court for an order to show cause ("OSC") why CCA should not be held in contempt for violating the court's dismissal order.  The district court referred the motion to Judge Carter, sitting by special designation in the District of Idaho.  CCA opposed the motion, partly on the ground that the district court did not have jurisdiction to enforce the settlement agreement.  The district court held it had jurisdiction to enforce the settlement agreement and issued the requested OSC.

## C.  Contempt Order

After a two-day hearing, the district court entered an order on September 16, 2013, holding CCA in contempt and ordering remedial measures.  The order was entered almost exactly two years after the entry of the order dismissing the suit and incorporating the settlement agreement.

The district court found CCA had materially breached the settlement agreement and, indeed, that there was "serious

doubt" whether CCA had ever substantially complied with it. The court relied in part on CCA's own investigative report, which indicated that from April to October 2012 approximately 4,800 mandatory post hours had been left vacant. The reported 4,800-hour figure included only night-shift hours during that seven-month period. In addition, evidence presented at the hearing showed vacancies had occurred during day-shifts over the period covered by the report, and additional vacancies had occurred after that period. For example, with respect to vacancies during the period covered by the report, ICC Warden (and Defendant) Timothy Wengler testified that CCA's investigation revealed roughly 150 vacant day-shift hours in May 2012 and 300 vacant day-shift hours in June 2012. IDOC official Timothy Higgins testified that IDOC had received reports from inmates at ICC that "the only time there was . . . full staffing was when our monitors were there." Higgins testified, with respect to vacancies after the period covered by the report, that daily staffing reports showed vacant mandatory post hours at ICC for June and July 2013 ranged from 18 to 41 hours per day.

The district court found further that CCA had "compelling reasons to regularly and thoroughly check that" it was in compliance, and that it knew or should have known it was in material breach of the settlement agreement. Before the parties executed the settlement agreement, multiple sources had informed the warden and assistant wardens at ICC that the facility was experiencing acute staffing shortages, and indications of ICC's staffing difficulties continued even after the parties entered into the settlement agreement. According to CCA's internal investigative report, members of ICC's senior management were aware of acute personnel shortages in the post-settlement period, during the spring, summer, and

fall of 2012. The report was corroborated by several witnesses who testified they informed CCA officials, including Warden Wengler, about staffing shortages.

Finally, the district court found CCA had not taken all reasonable steps to comply with the settlement agreement. For example, Higgins testified that CCA's reports of shift rosters indicated whether a post was covered by two or more employees but did not indicate the hours worked by each employee. This manner of reporting made it difficult to determine whether an employee was reported as having been simultaneously posted at more than one post ("double posted"). Warden Wengler, Assistant Warden Thomas Kessler, and Managing Director Kevin Myers testified that they neither checked for vacancies nor reviewed staffing records to ensure that the prison was fully staffed.

CCA eventually took a number of steps to ensure compliance with the settlement agreement, but it did so only after there had been an investigation into its staffing and recordkeeping. After the investigation, CCA implemented a "corrective action plan" including hiring more guards, maintaining more detailed staffing records, comparing staffing rosters with actual staffing, maintaining open lines of communication about potential staffing difficulties, and reviewing incidents resulting in vacancies. The district court found CCA should have taken these measures before the investigation.

The district court ordered several remedial measures. The settlement agreement was supposed to last for only two years, but the court extended it for another two years. The court appointed an independent monitor, to be paid by CCA. Finally, the court established a fine schedule. Under the

schedule, CCA would be required to pay $100 for each hour that a mandatory post was left vacant in excess of twelve hours in any calendar month. The court indicated it would increase the amount of the fines, if $100 per hour proved insufficient to compel compliance. In the end, the court never imposed fines for noncompliance. The court declined to impose several remedies requested by Plaintiffs, including ordering CCA to discipline more of its staff, conducting an audit to determine the total number of vacant hours since the execution of the settlement agreement, and requiring the submission of reports to the district court.

## D. Attorney's Fees

Plaintiffs' counsel, American Civil Liberties Union ("ACLU") attorneys Stephen Pevar and Ritchie Eppink, requested attorney's fees and costs associated with the contempt proceedings. Pevar sought compensation for 533.9 hours, and Eppink sought compensation for 253.2 hours. They also sought compensation for 174.1 hours of work performed by legal assistants, as well as $16,598.13 in costs. Plaintiffs' counsel based their attorney's fees request on an hourly rate of $213 per hour, which, at the time of the contempt proceedings, was 150 percent of the hourly rate set for counsel appointed in criminal cases, the maximum base rate allowed in cases governed by the Prison Litigation Reform Act ("PLRA"). They based their request for paralegal and student-intern fees on an hourly rate of $65 per hour. The court did not award fees for some of the hours Plaintiffs' counsel claimed because several time entries were vague, but otherwise determined Plaintiffs' requested hours, rates, and costs were reasonable.

Plaintiffs' counsel also requested a 2.0 multiplier of their fees. The court agreed to enhance the fee award, though not by the full amount requested. The court gave two reasons for the enhancement. First, Plaintiffs' counsel provided superior performance under extreme time pressure and with very limited resources. Second, prisoners in Idaho have such difficulty obtaining counsel for civil rights cases seeking declaratory and injunctive relief that Plaintiffs' counsel were likely the only attorneys willing to accept Plaintiffs' case.

Based on evidence of the hourly rates of Idaho attorneys with similar experience, the district court applied a 2.0 multiplier to the fees associated with Pevar's work and a 1.3 multiplier to the fees associated with Eppink's work, on the ground that these fees would compensate Plaintiffs' counsel for their superior performance and would be sufficient to induce competent Idaho attorneys to accept appointment in meritorious prisoner civil rights cases seeking declaratory and injunctive relief. In total, the court awarded $349,018.52 in attorney's fees and costs.

Pursuant to 28 U.S.C. § 1291, CCA timely appealed the district court's orders finding the court had subject matter jurisdiction to enforce the settlement agreement, finding CCA in contempt, and awarding attorney's fees and costs. *See Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 854 (9th Cir. 1992) (holding that post-judgment contempt orders imposing sanctions are final for purposes of § 1291).

## II. Standards of Review

We review *de novo* whether a district court has subject matter jurisdiction to enforce a settlement agreement, *Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1140 (9th Cir.

2003), a district court's interpretation of federal statutes, *San Luis & Delta Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012), and its interpretation of a settlement agreement, *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010). We review for abuse of discretion a district court's civil contempt order, *FTC v. EDebitPay, LLC*, 695 F.3d 938, 943 (9th Cir. 2012), and its award of attorney's fees, *Bouman v. Block*, 940 F.2d 1211, 1235 (9th Cir. 1991). We review the district court's factual findings in connection with a contempt order for clear error. *EDebitPay*, 695 F.3d at 943.

## III.  Discussion

### A.  Subject Matter Jurisdiction

The district court dismissed Plaintiffs' suit with prejudice after the parties reached a settlement. CCA contends the district court did not have subject matter jurisdiction to enforce the settlement agreement because the court's jurisdiction terminated when it dismissed the case. In other words, CCA maintains the parties' agreement is not enforceable in federal court. We disagree. The district court had federal question jurisdiction over Plaintiffs' suit under 28 U.S.C. § 1331; the settlement agreement was incorporated into the court's dismissal order; and the district court therefore had ancillary jurisdiction to enforce the settlement agreement.

Federal courts are courts of limited subject matter jurisdiction. A party alleging subject matter jurisdiction has the burden of establishing it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When a district court dismisses an action with prejudice pursuant to a settlement

agreement, federal jurisdiction usually ends. *O'Connor v. Colvin*, 70 F.3d 530, 532 (9th Cir. 1995). Ordinarily, a dispute arising under a settlement agreement is "a separate contract dispute requiring its own independent basis for jurisdiction." *Id*.

However, federal district courts have ancillary jurisdiction over certain matters "otherwise beyond their competence" that are "incidental to other matters properly before them." *Kokkonen*, 511 U.S. at 378. A federal court has jurisdiction to "manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* at 380. When a court's order dismissing a case with prejudice incorporates the terms of a settlement agreement, the court retains ancillary jurisdiction to enforce the agreement because a breach of the incorporated agreement is a violation of the dismissal order. *Id*. at 381.

CCA contends the district court did not have subject matter jurisdiction to enforce the settlement agreement in this case because the court's dismissal order did not incorporate the terms of the settlement agreement. CCA is wrong as a matter of law. Under federal law, a document incorporated into a dismissal order is part of the order. *See Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1059 (9th Cir. 2009). The district court's order explicitly incorporated the parties' stipulation for dismissal. The stipulation is therefore part of the dismissal order.

Stipulations for dismissal are construed according to the "basic contract principles" of local law. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). Here, we apply Idaho contract law, because the parties entered into the stipulation in Idaho, Plaintiffs are Idaho residents, and the stipulation

relates to CCA's business in Idaho. Under Idaho law, incorporation of a document into a contract makes the document part of the contract. *City of Meridian v. Petra Inc.*, 299 P.3d 232, 242 (Idaho 2013). The stipulation for dismissal explicitly incorporated the parties' settlement agreement and attached the agreement as an exhibit, thereby making the settlement agreement part of the stipulation. Thus, the parties' settlement agreement is incorporated into the court's dismissal order, and by violating the settlement agreement, CCA violated the order.

The district court dismissed this case under Federal Rule of Civil Procedure 41(a)(1)(A)(ii), which provides that an action may be dismissed when the plaintiff files "a stipulation of dismissal signed by all parties who have appeared." The Supreme Court has held that a district court that dismisses a case under this rule may "embody the settlement contract in its dismissal order . . . *if the parties agree*." *Kokkonen*, 511 U.S. at 381–82 (emphasis added). Here, the parties agreed the district court would retain ancillary jurisdiction to enforce the agreement. Paragraph 15 of the agreement establishes a three-step procedure for resolving disputes. Under this procedure, the parties must first attempt to resolve the dispute themselves. If they are unable to do so, they must then attempt to resolve the dispute with the Alternative Dispute Resolution Coordinator for the District of Idaho. If that attempt fails, the parties may "submit the dispute to the Honorable David O. Carter, who shall have authority to enforce the terms of this agreement *in his capacity as a Federal District Court Judge*." (Emphasis added.) Paragraph 15 thus provides that the district court shall have authority to enforce the agreement once the parties have taken a dispute through the first two steps of the dispute-resolution process.

Paragraph 1 of the agreement supports this interpretation of Paragraph 15. Paragraph 1 provides that the agreement will "extend no further than necessary to satisfy the requirements of 18 U.S.C. § 3626(a)(1)(A)." Under this provision of the PLRA, a federal district court may not order "prospective relief" unless it finds the relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A); *id.* § 3626(g)(7) (defining "prospective relief"). These limitations on "prospective relief" do not apply to private settlement agreements. *Id.* § 3626(c)(2). Paragraph 1's reference to § 3626(a)(1)(A) thus evinces the parties' intention to make the settlement agreement enforceable in federal court. We therefore conclude the district court had ancillary jurisdiction to enforce the settlement agreement, the terms of which were incorporated into the district court's dismissal order. For convenience, we hereafter refer only to the settlement agreement, with the caveat that the court's jurisdiction was based on CCA's violation of the dismissal order incorporating the agreement's terms.

## B. Finding of Contempt and Ordering of Remedies

The district court found by clear and convincing evidence that CCA was in civil contempt because it violated the settlement agreement and had failed to take all reasonable steps to comply. It is not seriously disputed that CCA was in substantial violation of the settlement agreement. The only serious disputes concern whether CCA's non-compliance justified a finding of contempt and whether the remedies ordered were appropriate. Because CCA has ceased providing staffing for ICC, the contempt and remedies

ordered by the district court are no longer relevant to CCA's operation of ICC.  However, they remain relevant for purposes of CCA's appeal because the attorney's fees award depends on the correctness of the court's conclusion that CCA was in contempt and on the appropriateness of the remedies ordered.

## 1.  All Reasonable Steps

CCA first contends the district court's contempt finding was an abuse of discretion because CCA implemented a number of corrective measures immediately after discovering that it was not in compliance with the settlement agreement. CCA's argument is based on a misunderstanding of well established law.

A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took *all* reasonable steps to comply with the order.  *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014). CCA emphasizes the steps it took to comply with the settlement agreement, but fails to mention other reasonable steps it could have taken.  For example, after the parties signed the settlement agreement, CCA increased the number of budgeted security staff positions at ICC.  CCA failed, however, actually to fill a substantial number of those budgeted positions.  Further, although Warden Wengler convened meetings to review staffing requirements, in some of those meetings he was informed that ICC was experiencing acute staffing difficulties.  Yet CCA failed to address those difficulties. Finally, CCA contends its senior management may not have known that ICC staff members were falsifying staffing rosters.  CCA failed, however, to take all reasonable steps

that would have allowed it to discover that records had been falsified.

Citing our decision in *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885 (9th Cir. 1982), CCA contends it should not have been found in contempt because it took immediate corrective action after learning of the inaccurate staffing reports. The facts in *Vertex*, however, are far afield from the facts here. In *Vertex*, the plaintiff requested the court find the defendant in contempt for violating a consent judgment that prohibited the defendant from using a particular trade name for publicity purposes. 689 F.2d at 887–88. Although the plaintiff proved the defendant was listed under that name in a local yellow pages directory, in violation of the judgment, we upheld the district court's decision not to find the defendant in contempt because the defendant had otherwise complied with the consent judgment and had taken steps to remove the trade name from its yellow pages listing as soon as it discovered the listing. *Id.* at 891–92.

Here, by contrast, the district court found CCA had not substantially complied with the settlement agreement and had failed to take several reasonable steps to ensure compliance. Moreover, the court found CCA's "corrective action plan" was itself inadequate. Indeed, just one month before the contempt proceedings began, mandatory posts at ICC were still left vacant between 18 and 41 hours per day.

## 2. Nature of the Sanctions

CCA objects to two of the ordered remedies — the extension of the settlement agreement and the prospective fine schedule — on the ground that they are criminal

sanctions and that the district court did not follow procedures that would have allowed it to hold CCA in criminal contempt.

Unlike civil contempt, criminal contempt requires the procedural safeguards applicable in criminal proceedings, including proof beyond a reasonable doubt. *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1139 (9th Cir. 2001). It is undisputed that when the district court found CCA in contempt the court did not provide all of the procedural protections required in criminal proceedings. Thus, if the district court's contempt finding and the associated remedies were criminal in nature, the finding and remedies were improper and would have to be reversed.

Whether contempt is civil or criminal turns on the nature of the sanction or sanctions involved. *Int'l Union, United Mine Workers v. Bagwell (Bagwell)*, 512 U.S. 821, 827–28 (1994). "[A] sanction generally is civil if it coerces compliance with a court order or is a remedial sanction meant to compensate the complainant for actual losses. A criminal sanction, in contrast, generally seeks to punish a 'completed act of disobedience.'" *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013) (quoting *Bagwell*, 512 U.S. at 828).

We conclude the extension of the settlement agreement is a compensatory civil sanction. Rather than punishing CCA, this sanction sought to return Plaintiffs as nearly as possible to the position they would have occupied had CCA not violated the agreement. The settlement agreement required CCA to provide a certain number of security personnel at ICC for two years. CCA failed to provide the required number of personnel during that two-year period. By extending the

settlement agreement for two years, the district court thus ordered the relief to which Plaintiffs were originally entitled under the agreement but that CCA had failed to provide.

We need not reach the question whether the fines would have been coercive and therefore civil, for the district court never actually imposed fines. The court merely informed CCA of the fines that would have resulted had CCA continued to violate the settlement agreement after the conclusion of the contempt proceedings. Informing CCA of the prospective fine schedule was not itself a sanction. *Cf. S.E.C. v. Hickey*, 322 F.3d 1123, 1127–28 (9th Cir. 2003) (holding a contempt order announcing a fine is not final for purposes of 28 U.S.C. § 1291 until the court imposes the fine).

We therefore conclude the court's contempt finding is civil in nature.

### C. Extension of the Settlement Agreement

CCA contends the district court's decision to extend the settlement agreement by two years was an abuse of discretion. We disagree.

The settlement agreement's original terms, which were incorporated into the district court's dismissal order, provided that the agreement would terminate "on the two year anniversary of the date" it was executed. The extension of the settlement agreement was therefore a modification of a court order.

Courts have long had inherent power to modify court orders in changed circumstances. *See United States v. Swift*

*& Co.*, 286 U.S. 106, 114–15 (1932). This power is now codified at Rule 60(b) of the Federal Rules of Civil Procedure. *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999). Under well established law, substantial violation of a court order constitutes a significant change in factual circumstances. *See Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1120–22; *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 828–29 (4th Cir. 2005); *David C. v. Leavitt*, 242 F.3d 1206, 1212 (10th Cir. 2001); *Holland v. New Jersey Dep't of Corrs.*, 246 F.3d 267, 283–84 (3d Cir. 2001); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1019–20 (6th Cir. 1994). Further, a modification of a court order is "suitably tailored to the changed circumstance" when it "would return both parties as nearly as possible to where they would have been absent" the changed circumstances. *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002) (emphasis omitted). Here, the court's extension of the settlement agreement returned Plaintiffs to the position they would have occupied had CCA not violated the agreement from its inception. The modification of the settlement agreement was therefore well within the court's inherent power.

CCA further contends the district court abused its discretion by extending the entire settlement agreement instead of extending only the staffing requirements embodied in paragraph 4. In particular, CCA argues there is no evidence that it failed to comply with the settlement agreement's other provisions, including requirements that CCA investigate and prepare a report on all inmate-on-inmate assaults, encourage good behavior by inmates, report aggravated batteries to the Ada County Sheriff's Office, and make housing assignments consistent with IDOC's Standard Operating Procedure.

The district court's findings were not confined to the failure of CCA to fulfill the staffing requirements. The court found, in addition, that the "same supervisors who signed falsified record sheets remain[ed] on the job," and that CCA's shoddy record keeping "obscured who was working at what posts and at what times." In light of these findings, the district court doubted CCA's "compliance in other respects, such as whether every violent incident is reported." Further, the district court was reasonably concerned that CCA's failure to comply with staffing requirements affected its ability to comply with the settlement agreement's other requirements. The court's conclusion that the extension of the entire agreement was suitably tailored to correct CCA's non-compliance was thus not an abuse of discretion.

For the same reason, we reject CCA's contention that extending the entire settlement agreement violates 18 U.S.C. § 3626(a)(1)(A)'s limitations on prospective relief. Plaintiffs brought this case under 42 U.S.C. § 1983 for alleged violations of their Eighth Amendment rights. When the district court and the parties approved the settlement agreement, there was no dispute that its remedies were narrowly drawn, necessary, and the least intrusive means to bring ICC into compliance with the Eighth Amendment, in accordance with § 3626(a)(1)(A). The same remedies remain narrowly drawn, necessary, and the least intrusive means to rectify CCA's continued Eighth Amendment violations.

## D. Attorney's Fees

The district court awarded Plaintiffs attorney's fees and costs associated with the contempt proceedings. CCA contends the attorney's fees award violates the PLRA. We disagree.

### 1.  Attorney's Fees in Prisoner Civil Rights Cases

The PLRA was enacted "to deter frivolous prisoner lawsuits that needlessly wasted judicial resources." *Woods v. Carey*, 722 F.3d 1177, 1182 (9th Cir. 2013).  Congress sought to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  Toward this end, Congress introduced a "variety of reforms designed to filter out the bad [prisoner] claims and facilitate consideration of the good." *Jones v. Bock*, 549 U.S. 199, 204 (2007).  Among the reforms were changes to the manner in which attorney's fees are determined in prisoner civil rights cases.

The PLRA's provisions relating to attorney's fees apply to "any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U.S.C. § 1988]."  42 U.S.C. § 1997e(d)(1).   Section 1988 is an exception to the "American Rule" that each party ordinarily bears its own attorney's fees. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).   Section 1988 authorizes courts to award "a reasonable attorney's fee as part of the costs" to a "prevailing party" in cases brought under various civil rights statutes, including § 1983.  42 U.S.C. § 1988(b).  Section 1988 is asymmetrical, awarding attorney's fees to civil rights plaintiffs if they are prevailing parties, but awarding attorney's fees to prevailing civil rights defendants only if plaintiffs' claims are frivolous.  *See Hughes v. Rowe*, 449 U.S. 5, 14–15 (1980).  The purpose of § 1988 is "to ensure that federal rights are adequately enforced." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010).  Thus, "a reasonable attorney's fee" is one that is "sufficient to induce

a capable attorney to undertake the representation of a meritorious civil rights case." *Id.* at 552.

Federal courts employ the "lodestar" method to determine a reasonable attorney's fees award under § 1988. The lodestar method is a two-step process. *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000). First, a court calculates the lodestar figure by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate. *Id.* A reasonable hourly rate is ordinarily the "prevailing market rate[] in the relevant community." *Perdue*, 559 U.S. at 551 (citation omitted). The lodestar figure "roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case," *id.* (emphasis omitted), and is therefore a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). Second, the court determines whether to modify the lodestar figure, upward or downward, based on factors not subsumed in the lodestar figure. *See Perdue*, 559 U.S. at 553–54; *Morales v. City of San Rafael*, 96 F.3d 359, 363–64 & n.8 (9th Cir. 1996), *as amended on denial of reh'g*, 108 F.3d 981 (9th Cir. 1997).

The PLRA alters the lodestar method in prisoner civil rights cases in three fundamental ways. First, rather than hours reasonably expended in the litigation, hours used to determine the fee award are limited to those that are (1) directly and reasonably incurred in proving an actual violation of the plaintiff's rights and (2) either proportionately related to court-ordered relief or directly and reasonably incurred in enforcing such relief. 42 U.S.C. § 1997e(d)(1). Second, in actions resulting in monetary judgments, the total amount of the attorney's fees award

associated with the monetary judgment is limited to 150 percent of the judgment. *Id.* § 1997e(d)(2); *see Jimenez v. Franklin*, 680 F.3d 1096, 1100 (9th Cir. 2012).  This limitation does not apply to actions (or parts of actions) resulting in non-monetary relief.  Third, the hourly rate used as the basis for a fee award is limited to 150 percent of the hourly rate used for paying appointed counsel under the Criminal Justice Act, 18 U.S.C. § 3006A (the "CJA rate"). 42 U.S.C. § 1997e(d)(3).  Hereafter, we refer to 150 percent of the CJA rate as the "PLRA rate."  Notably, the PLRA is silent as to the second step of the lodestar method, in which a court may adjust the lodestar figure based on factors not subsumed in that figure.

## 2.  The Fee Enhancements Under the PLRA

The district court concluded Plaintiffs were entitled to reasonable attorney's fees and costs because they were "prevailing part[ies]" in a case brought under § 1983.  *See* 42 U.S.C. § 1988.  The court used the lodestar method, as modified and limited by the PLRA, to determine reasonable attorney's fees.  The court first multiplied the number of hours directly and reasonably expended in enforcing the settlement agreement by the PLRA rate to arrive at the lodestar figure.  The court then enhanced the lodestar figure based on factors not already subsumed in that figure.

CCA contends the attorney's fees award violates the PLRA.  According to CCA, in a suit for injunctive or declaratory relief, the PLRA prohibits an attorney's fees award exceeding the amount determined by multiplying the number of hours permitted under § 1997e(d)(1) by the PLRA rate specified in § 1997e(d)(3).  That is, CCA contends the PLRA forbids a court from enhancing the lodestar figure,

even if the enhancement is based on factors not subsumed in that figure. We disagree and conclude the PLRA allows enhancement of the lodestar figure in appropriate circumstances. Our conclusion follows from two principles of statutory interpretation.

First, a "party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 521 (1989). When Congress enacted the PLRA, the lodestar method for determining a reasonable attorney's fees award under § 1988 had already "achieved dominance in the federal courts." *Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002). As explained above, the lodestar method is a two-step process. A court first determines the lodestar figure by multiplying the hours reasonably expended by a reasonable hourly rate; it then determines whether to adjust that figure upward or downward. *See, e.g.*, *Blum v. Stenson*, 465 U.S. 886, 892–96 (1984) (addressing hourly rates); *id.* at 896–902 (addressing enhancements); *Hensley*, 461 U.S. at 433–34 (addressing hourly rates); *id.* at 434–37 (addressing enhancements). There is nothing in the attorney's fees provisions of the PLRA that instructs a court not to take both steps in this process.

A comparison to the attorney's fees provision of the Individuals with Disabilities in Education Act ("IDEA") is instructive. The IDEA specifies that attorney's fees awarded under that statute shall be "based on rates prevailing in the community." 20 U.S.C. § 1415(i)(3)(C). The next sentence, in language not found in the PLRA, then specifies: "No bonus or multiplier may be used in calculating the fees awarded under this subsection." *Id.* As this sentence illustrates, Congress knows how to instruct a court not to

adjust the lodestar figure. Yet such instruction is conspicuously absent from the PLRA. Congress' silence is "strong evidence that the usual practice should be followed." *Jones*, 549 U.S. at 212. That is, Congress' silence is strong evidence that the PLRA contemplates the continuation of the normal practice under § 1988 of adjusting the lodestar figure by factors not subsumed in that figure.

Second, when "Congress includes particular language in one section of a statute but omits it in another — let alone in the very next provision — [federal courts presume] that Congress intended a difference in meaning." *Loughrin v. United States*, — U.S. —, 134 S. Ct. 2384, 2390 (2014) (citation omitted). In cases involving monetary judgments, the PLRA expressly limits the total amount of the attorney's fees award associated with the monetary judgment to 150 percent of the judgment. 42 U.S.C. § 1997e(d)(2); *see Jimenez*, 680 F.3d at 1100. By contrast, § 1997e(d)(3), addressed to attorney's fees awards not associated with monetary judgments, does not express a limitation on the total amount of those awards. Instead, it limits only the hourly rate that an award may be "based on." 42 U.S.C. § 1997e(d)(3). We infer from the presence of an express limitation on the total amount of attorney's fees awards in § 1997e(d)(2), and the absence of such a limitation in § 1997e(d)(3), that Congress did not intend the latter section — the section relevant to this appeal — to "cap" the total amount of attorney's fees awards. We therefore hold that, while the PLRA limits the hours and the hourly rate used in calculating the lodestar figure, it does not cap the total amount of attorney's fees awards in cases seeking declaratory and injunctive relief, and it continues to authorize a court to enhance the lodestar figure based on non-subsumed factors.

CCA makes several specific objections to this conclusion, none of which is persuasive. First, CCA contends the Supreme Court's decision in *Martin v. Hadix*, 527 U.S. 343 (1999), compels us to treat the hourly rate prescribed in § 1997e(d)(3) as a maximum hourly rate that cannot be enhanced by a non-subsumed factor. The Court's opinion in *Martin* stated that the PLRA "places a cap on the size of attorney's fees that may be awarded in prison litigation suits." *Id.* at 350. CCA contends this statement tells us that § 1997e(d)(3) caps the total amount of attorney's fees awards, but CCA quotes the statement out of context. The Court continued: "Court-appointed attorneys in the Eastern District of Michigan are compensated at a maximum rate of $75 per hour, and thus, . . . the PLRA fee cap for attorneys working on prison litigation suits translates into a maximum hourly rate of $112.50." *Id.* When read in context, the Court's statement merely invokes the undisputed proposition that § 1997e(d)(3) limits the hourly rate that may be used for determining the lodestar figure.

Second, CCA contends § 1997e(d)(3) already provides for the possibility of an enhancement. According to CCA, the CJA rate is the presumptive hourly rate under the PLRA, and § 1997e(d)(3) affirmatively authorizes fee enhancements not exceeding 150 percent of that rate. CCA does not cite, nor have we been able to find, any authority supporting this contention. As we have noted above, the PLRA explicitly refers to § 1988 as the governing framework for determining a reasonable attorney's fees award. 42 U.S.C. § 1997e(d)(1). Attorney's fees awards under § 1988 are determined by first multiplying the relevant hourly rate by the number of hours reasonably spent. Section 1997e(d)(3) provides only that fee awards may not "be based on an hourly rate greater than 150 percent" of the CJA rate. That is, the rate limited by

§ 1997e(d)(3) is the base rate used to calculate the lodestar figure, which is the PLRA's counterpart to the prevailing market rate used in non-PLRA cases. Only after calculating the lodestar figure using this base rate does a court then determine whether to apply an enhancement to that figure.

Third, CCA contends allowing enhancements under the PLRA renders the 150 percent limitation in § 1997e(d)(3) a dead letter. The 150 percent limitation on the base hourly rate for calculating an attorney's fees award is meaningless, CCA contends, if the district court may enhance that hourly rate. CCA overstates the matter, ignoring important limitations on a district court's determination of attorney's fees awards and its discretion to enhance them. Not only does the PLRA limit the hours for which attorney's fees may be awarded and the total fees that may be awarded in a case resulting in a monetary award, *see* § 1997e(d)(1) & (d)(2), but enhancements to the lodestar figure are available only "in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Perdue*, 559 U.S. at 554. Further, the fee applicant bears the "the burden of proving that an enhancement is necessary" and "must produce specific evidence that supports the award." *Id.* at 553 (citations and internal quotation marks omitted). Finally, even when an enhancement is appropriate, of course, it may not be based on considerations already subsumed in the PLRA rate.

### 3. Justifications for the Enhancement

The remaining question is whether the district court in this case provided clear reasons, supported by specific evidence in the record, for enhancing the lodestar figure. We

conclude it did. The district court relied on two non-subsumed factors to justify its attorney's fees enhancement — superior performance and the need to attract competent counsel. We consider these factors in turn.

### a. Superior Performance

The district court enhanced the lodestar figure in part because it found Plaintiffs' counsel had provided superior performance. In *Perdue*, the Supreme Court held, although the lodestar figure typically subsumes "the novelty and complexity of a case" and "the quality of an attorney's performance," a court may enhance the lodestar in "rare" and "exceptional" circumstances when the lodestar figure does not adequately represent counsel's "superior performance and commitment of resources." 559 U.S. at 553–54 (citation omitted). The Court gave several examples of such circumstances, including one that is relevant here. A court may enhance the lodestar figure when "the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation." *Id.* at 554–55. Thus, in non-PLRA civil rights cases, a court may enhance the lodestar figure if plaintiff's counsel demonstrates the value of her services exceeds what the court determines to be the prevailing market rate for otherwise comparable attorneys.

In PLRA cases, the analysis is similar to that in other civil rights cases, though a court must calculate the lodestar figure using a base rate no greater than the PLRA rate specified in § 1997e(d)(3). In other words, the PLRA rate virtually always replaces the prevailing market rate as the presumptively reasonable rate in the court's determination of

the lodestar figure because actual prevailing rates are very unlikely to be as low as the PLRA rate.  *See, e.g.*, *Webb v. Ada Cnty.*, 285 F.3d 829, 838–39 (9th Cir. 2002); *Graves v. Arpaio*, 633 F. Supp. 2d 834, 854–55 (D. Ariz. 2009); *Ilick v. Miller*, 68 F. Supp. 2d 1169, 1174 (D. Nev. 1999); *Lozeau v. Lake Cnty.*, 98 F. Supp. 2d 1157, 1171 (D. Mont. 2000); *Rodriguez v. Cnty. of L.A.*, 96 F. Supp. 3d 1012, 1021 (C.D. Cal. 2014).  Like the prevailing rate in a non-PLRA case, the PLRA rate generally subsumes the factors relevant to the determination of a reasonable attorney's fee, including the novelty and complexity of the case and the quality of the attorney's performance.  However, as in non-PLRA cases, the district court may enhance the lodestar figure when plaintiff's counsel's "superior performance and commitment of resources" is "rare" and "exceptional" as compared to the run-of-the-mill representation in such cases.  *Perdue*, 559 U.S. at 553–54 (citation omitted).

Citing *Perdue*, the district court found "Plaintiffs' counsel achieved excellent results for their clients under extreme time pressure and with very limited resources."  The court found further that Plaintiffs' counsel provided "extraordinary performance yielding extraordinary results," and that "the quality of the work that produced these results [was] underrepresented in the hourly fee."  We conclude the district court did not abuse its discretion in so finding.

The district court's justification for enhancing the lodestar figure was supported by specific evidence in the record.  The court's statement that Plaintiffs' counsel labored "under extreme time pressure and with very limited resources" was, if anything, an understatement.  Plaintiffs' counsel had only twenty-six days to conduct discovery in preparation for the contempt hearing.  During that period, Plaintiffs' two

attorneys not only engaged in extensive motions practice, writing numerous pre-trial briefs; they also conducted an extraordinary amount of discovery.   They interviewed, deposed, and prepared numerous witnesses in three states and obtained and reviewed roughly 7,000 pages of discovery. Most of the documents were produced for their review only five days before the beginning of the hearing.  Some were even produced for review on the first evening of the hearing. Despite these constraints, Plaintiffs' counsel uncovered substantial evidence of noncompliance with the settlement agreement.  Based on this evidence, they obtained a contempt finding and secured significant remedies for their clients.

CCA does not dispute the constraints under which Plaintiffs' counsel labored, but it contends counsel did not achieve extraordinary results.   First, CCA contends the remedies obtained did "nearly nothing" for Plaintiffs because Plaintiff Miera was the only named Plaintiff who remained incarcerated at ICC during the contempt hearing.  CCA is wrong in so contending.  The parties settled the suit before the district court decided whether to certify a class, but the suit had been filed as a putative class action, and the settlement agreement's intended beneficiaries were all prisoners at ICC.  Plaintiffs' counsel achieved significant results for these beneficiaries by obtaining a contempt finding against CCA and a two-year extension of the settlement agreement. *See Hook v. Ariz. Dep't of Corr.*, 972 F.2d 1012, 1014–15 (9th Cir. 1992) (intended beneficiaries may enforce a court order).

Second, CCA seeks to minimize the importance of the relief obtained by Plaintiffs' counsel by pointing to an offer it made during negotiations preceding the contempt hearing. Three weeks before the start of the hearing, CCA offered, in

exchange for not being subject to a finding of contempt, to extend the settlement agreement for one year; to hire a monitor of its own choosing to review staffing at ICC; and to pay Plaintiffs' reasonable attorney's fees and costs associated with the OSC. CCA compares this offer to the relief ultimately granted by the court and contends the additional relief ordered by the court, over and above CCA's offer, was insignificant. Again, CCA is wrong in so contending. After the hearing, Plaintiffs obtained an express finding of contempt and a two-year extension of the settlement agreement. This relief is substantially more than was offered by CCA. Moreover, Plaintiffs' counsel had initiated contempt proceedings a month before CCA made its offer of settlement, and CCA's offer was the product of the work Plaintiffs' counsel had already put into the case.

### b. Attracting Competent Counsel

The district court also enhanced the lodestar figure because it found the limited fees available in prisoner civil rights cases, without enhancement, are insufficient to induce private attorneys in Idaho to accept cases, such as this one, seeking declaratory and injunctive relief. The court found Plaintiffs' counsel "were likely the only attorneys willing to accept" Plaintiffs' case.

CCA contends the district court's rationale is an impermissible ground for enhancing the lodestar figure in a case governed by the PLRA because it undermines the PLRA's goal of reducing the number of prisoner lawsuits. CCA's position would maximize one of the PLRA's goals by eviscerating the other. The PLRA's purposes are to "reduce the quantity *and* improve the quality of prisoner suits." *Porter*, 534 U.S. at 524 (emphasis added). Thus, while the

PLRA was an effort to "eliminate frivolous lawsuits," it was not an effort to "eliminate the ameliorative effect achieved by valid constitutionally-based challenges." *Cano v. Taylor*, 739 F.3d 1214, 1219 (9th Cir. 2014); *see Woods*, 722 F.3d at 1182–83.

Improving the quality of prisoner suits requires that plaintiffs with meritorious civil rights cases be able to secure competent counsel. When the lodestar figure based on the PLRA rate is insufficient to induce competent attorneys to accept appointment in meritorious civil rights cases, it is by definition not a reasonable fee. *See Perdue*, 559 U.S. at 552. When a plaintiff demonstrates with specific evidence that no competent attorney is willing to take on a meritorious civil rights case because of insufficient fees, the district court furthers the PLRA's purpose by enhancing the lodestar figure by an amount reasonably calculated to induce competent lawyers in the relevant community to take such cases. *See id.* at 554 (a fee enhancement is appropriate when there is "specific evidence that the lodestar fee would not have been adequate to attract competent counsel" (citation and internal quotation marks omitted)).

Based on evidence in the record, the district court found that, due to the inadequacy of the unenhanced PLRA rate, Idaho attorneys, save for Plaintiffs' counsel, have been unwilling to accept appointment in prisoner civil rights cases seeking injunctive and declaratory relief. Plaintiffs' lead counsel, Stephen Pevar, stated in a declaration that he was not aware of any attorney or organization, other than his organization and attorneys associated with Idaho Legal Aid Services, Inc., that had filed a prisoner class action in Idaho seeking injunctive relief since the PLRA was enacted. However, Legal Aid Services is now unable to represent

prisoners in PLRA cases. Howard Belodoff, the Associate Director of Idaho Legal Aid Services, Inc., stated in a declaration that since 1996 a federal regulation has prohibited his organization from representing plaintiffs in cases governed by the PLRA, on pain of losing its primary source of funding. Finally, J. Walter Sinclair, Jason Monteleone, and Jason Wood, three Idaho practitioners, stated in declarations that they were unaware of any attorney or organization in Idaho, other than the ACLU, that would litigate PLRA suits seeking only declaratory and injunctive relief. Accordingly, we conclude the district court did not abuse its discretion in enhancing the attorney's fees award to ensure that it was adequate to attract competent counsel in comparable cases.

### 4. Challenges To Line Items in the Fee Request

CCA contests some of the line items for which Plaintiffs were awarded attorney's fees. Specifically, CCA contends Plaintiffs should not have been awarded attorney's fees for two attorneys to attend depositions, and they contend Plaintiffs should not have received attorney's fees for the performance of certain clerical tasks. We conclude the district court did not abuse its discretion in awarding fees for these items.

### Conclusion

For the foregoing reasons, we affirm the district court's contempt order and its order awarding attorney's fees.

**AFFIRMED.**